ASA P. PETTIBONE & another *vs.* TOLEDO, CINCINNATI,
AND ST. LOUIS RAILROAD COMPANY & others.

Suffolk.   November 22, 1888. — January 5, 1889.

Present : MORTON, C. J., FIELD, HOLMES, & KNOWLTON, JJ.

*Equitable Attachment — Executory Agreement — Subscription — Chose
in Action — " Debt."*

An executory agreement under seal between a railroad company and certain of its
first mortgage bondholders, whereby, in consideration of the issue to them of
debenture bonds of the company, each subscribes and agrees to pay to it moneys
with which to pay its floating debts and put its road in running condition, does
not establish a trust in favor of a creditor of the company ; and a bill in equity
by a creditor, under the Pub. Sts. c. 151, § 2, cl. 11, and the St. of 1884, c. 285,
will not lie to reach and apply the moneys so subscribed in payment of a debt
due from the company to him.

BILL IN EQUITY, filed on June 23, 1884, to reach and apply
in payment of a claim of the plaintiffs against a foreign railroad
corporation sums of money alleged to be due to such corpora-
tion from the other defendants, who alone defended. Service
by publication only, in accordance with an order of notice duly
issued, was made upon the railroad corporation, which did not
appear generally or specially.

The bill, as amended, alleged that the plaintiffs were part-
ners doing business in the city of Chicago as dealers in rail-
road equipments and supplies; that the Toledo, Cincinnati, and
St. Louis Railroad Company, while engaged in completing and
operating a system of railroads extending from Toledo to St.
Louis and Cincinnati, became embarrassed, and failed to pay
the interest on its mortgage bonds; that in December, 1882,
a plan was formed to raise by subscription the sum of about
$800,000, to complete such system of roads and build the ne-
cessary sidings and depots, perfect the terminal facilities, and
put all in working condition, and to pay the floating debts of
the company; that in pursuance of such plan, " certain holders
of the first mortgage bonds of said railroad company made and
entered into an agreement in writing under seal with said rail-
road company, whereby they subscribed and agreed to pay,
respectively, to said railroad company a certain sum of money

as called for, the first call to be for fifteen per centum of such subscription, and no subsequent call to exceed ten per centum thereof in any one month, the subscribers to receive therefor the debenture bonds of said railroad company, payable in five years, with option on the part of the company to pay after two years from that date, and bearing interest at the rate of eight per cent per annum, payable semiannually, said subscription to become binding when approved in writing " by three persons named, provided said approval should be given within a limited time from the date of the agreement of subscription; that the railroad company agreed to use the money so subscribed to complete its system of roads in all parts and departments, and to pay its floating debts; that the defendants were among the holders of such bonds who signed such agreement; that the subscriptions were duly approved in writing within the time limited, and the company called upon the subscribers to make payments according to the terms of their subscriptions; and that the defendants were indebted to the company, not only for such portions of their subscriptions as had been called, but for those that had not been called.

The bill further alleged, that the plaintiffs, from August, 1882, to July, 1883, at the request of the authorized agents of the company, sold and delivered to it large quantities of railway supplies and equipments, all of which articles were at the time of their sale and delivery necessary for the proper running and operation of the road, and for the transaction of its current business, and to keep the road in running order, and all of which were actually used in the repair, keeping up, and operation of the railroad company under the direction of its proper officers and servants; that a full statement and bills of the material and supplies so furnished were presented to the proper officers of the company, and duly audited and approved by them; that, during the time when such supplies and materials were purchased and used, the railroad company was actually operating its line from Toledo to Cincinnati, and also was constructing and operating, so far as possible, a line from Toledo in the direction of St. Louis; that it was considered by the officers of the company desirable to complete the road to St. Louis, as necessary to its success; and that such officers used the moneys

derived from such subscriptions for the purpose of completing the road to St. Louis, and of increasing the revenues of the company, instead of applying them to the payment of such equipment supplies furnished the road.

The bill also alleged, that the plaintiffs were able, ready, and willing, and offered, to furnish a sufficient number of debenture bonds of the company to supply all claims and demands of the defendants according to the terms of their subscriptions, either in behalf of the company or in any proper manner, on payment, or prior to the time of the payment, of such subscriptions, or the balance thereof remaining unpaid ; and further, to do any and every thing necessary and proper to place the company and all the defendants in the same position, and with the same rights and liabilities, they would enjoy or be subject to if the company had tendered and stood ready to deliver the debenture bonds to them.

The prayer of the bill was, that upon the delivery by the plaintiffs of such debenture bonds, or other proper disposition of them, the defendants might be ordered to pay over all sums of money due upon their several subscriptions for the benefit of the plaintiffs, or that the claim of the railroad company against the defendants upon their subscriptions, both called and un-called, might be sold, and the proceeds applied to the payment of the plaintiff's claim ; and for further relief.

The defendants demurred to the bill, on the grounds, among others, that it did not appear that there was any debt due under the subscription agreement from the defendants to the company, or that the rights of the plaintiffs as creditors of the company were superior to the rights of the defendants as creditors thereof, or that there was any privity of contract between the plaintiffs and the defendants; and for want of equity.

Hearing before *Devens*, J., who reserved the case, upon the bill and demurrers, for the consideration of the full court.

*H. D. Hyde & W. A. Sargent*, for the defendants.

*J. Lowell & J. H. Flint*, (*J. C. Lane* with them,) for the plaintiffs.

FIELD, J.   The first ground on which the plaintiffs contend that the bill may be maintained is, that the subscriptions of the defendants, which are described in the bill, are analogous to

414 PETTIBONE *v.* TOLEDO, &c. RAILROAD. [148

subscriptions for the capital stock of a corporation, and that such subscriptions constitute a trust fund for the benefit of the creditors of the corporation.

It has been held, that all persons who deal with a corporation deal with it on the faith that its capital stock will be applied, if necessary, to the payment of its debts, and that, if the statutes of a State permit a corporation to do business before the whole amount of its capital stock has been paid in, the money which subscribers for stock have agreed to pay in for the stock they have taken is regarded as a part of the capital stock of the corporation. The admission of the subscribers as stockholders is the consideration for their promises to pay, and the corporation can recover the amount agreed to be paid, not merely as a debt due to the corporation, but as a part of the capital stock which the subscribers have agreed to furnish and put at the risk of the business. The unpaid subscriptions are a trust fund held for the benefit of the creditors of the corporation, and any creditor whose debt has been reduced to a judgment, and who has been unable to obtain satisfaction of it from the corporation, may, under the general jurisdiction of a court of chancery, maintain a bill to apply these subscriptions to the payment of his judgment. *Sawyer* v. *Hoag*, 17 Wall. 610. *Hatch* v. *Dana*, 101 U. S. 205. *Morgan* v. *Allen*, 103 U. S. 498. *Bartlett* v. *Drew*, 57 N. Y. 587.

If we assume that this is the law in this Commonwealth, it is necessary to examine the nature of the subscriptions set out in the bill. The bill alleges that, in December, 1882, "certain holders of the first mortgage bonds of said railroad company made and entered into an agreement in writing under seal with said railroad company, whereby they subscribed and agreed to pay, respectively, to said railroad company a certain sum of money as called for, the first call to be for fifteen per centum of such subscription, and no subsequent call to exceed ten per centum thereof in any one month, the subscribers to receive therefor the debenture bonds of said railroad company, payable in five years, with option on the part of the company to pay after two years from that date, and bearing interest at the rate of eight per cent per annum, payable semiannually," etc. The bill also alleges that the persons named as defendants signed this agree-

ment, with others whose names the plaintiffs are unable to state; that the company has called for the payment of certain instalments of the money agreed to be paid ; that the defendants have not paid the sums called for, and now owe the company these sums, and that they also under said agreement owe the company certain additional amounts not yet called for.

It thus appears that the defendants are holders of the first mortgage bonds of the railroad company, and have agreed to lend the company certain amounts of money, and to take in payment therefor bonds of the company, such as have been described. They are creditors of the company who have agreed to make an additional loan. Even if the agreement be construed to be an agreement to purchase bonds of the company, as the bonds are obligations of the company to pay money, the transaction would be equivalent to a loan.

The distinction between a creditor and a stockholder of a corporation is plain. The position of a stockholder is not only not like that of a creditor, but it more nearly resembles that of a debtor of the creditors of a corporation. In a partnership, the copartners are debtors *in solido ;* in corporations, the artificial body is the debtor, but the property of the corporation, which must be applied to the payment of its debts, belongs equitably to the stockholders, and they are virtually the debtors of the creditors of the corporation, so far as it may be necessary to take this property to pay such creditors. If these defendants should lend the money as they have agreed, and should receive the bonds of the company, they would be entitled to have the bonds paid out of the property of the company when they matured, or, if the company was insolvent, to share with other creditors in this property. The defendants have no other control over the corporation than that which a creditor has over the property of his debtor, nor have they put or agreed to put their money at the risk of the business in any other sense than that in which every creditor puts the money he lends at the risk of the solvency of his debtor. If the capital stock of a corporation is a trust fund for the benefit of its creditors, and if subscribers to stock who have not paid their subscriptions are regarded as trustees of this fund to the extent of the subscription unpaid, then these defendants have agreed to become *cestuis que trust*

of this fund.  We think there is no foundation for the analogy suggested.

It is clear that the bill does not set out any special trust in favor of the plaintiffs.  The defendants have made no promises to the plaintiffs, nor has it been agreed between the defendants and the company that the money should be paid and received upon a trust in favor of the plaintiffs.  The plaintiffs have furnished railroad supplies, and the defendants have agreed to lend money to enable the company to complete its railroad; but this does not constitute a trust for the plaintiffs.

The remaining ground on which the plaintiffs contend that the bill may be maintained is, that by this agreement the defendants have become indebted to the company, and that this indebtedness can be reached and applied to the payment of the plaintiff's claim, under the Pub. Sts. c. 151, § 2, cl. 11, and the St. of 1884, c. 285.  The first statute on this subject was the St. of 1851, c. 206.  This gave a remedy in equity " to reach and apply, in payment of a debt due from any debtor not residing in this Commonwealth, any property, right, title, or interest, legal or equitable, of such debtor, within this Commonwealth, which cannot be come at to be attached or taken on execution in a suit at law against such debtor."  This statute was amended by the St. of 1858, c. 34, by striking out the words " not residing in this Commonwealth," and the two statutes have become incorporated in the Pub. Sts. c. 151, § 2, cl. 11.  Full equity jurisdiction was first conferred upon this court by the St. of 1857, c. 214, and until that statute was passed the court had jurisdiction in equity only upon special subjects described in the statutes.

It has often been held that the intention of the St. of 1851, c. 206, was not to give jurisdiction over " a ' creditor's bill,' in the sense in which those words are used in the practice of courts of chancery."  *Chapman* v. *Banker and Tradesman Publishing Co.* 128 Mass. 478.  The words " creditor's bills " are commonly used in the English chancery to describe bills brought by the creditors of the estate of a deceased person for the administration of the estate, or by creditors and claimants of a trust fund for the distribution of the fund.  Such bills may be brought by many individual creditors jointly, or, if brought by one creditor, must

be brought for the benefit of himself and all other creditors interested in the estate or the fund. But the words are also used to describe bills brought by creditors who have obtained judgments at law, and who have in vain attempted at law to obtain satisfaction of the judgments, and who sue in equity for the purpose of reaching property which could not be taken on execution at law. Such bills could be maintained by a single creditor without joining others.

It is obvious that the Legislature had in mind in passing this statute suits substantially of the latter description; and such suits or similar suits must be considered, if any help is to be derived from analogy. There was valuable property of various kinds in this Commonwealth when the St. of 1851, c. 206, was passed, which was not exempt by statute from being taken on execution, and yet could not be reached by any form of process then existing. If the debtor were found within the Commonwealth, he could be arrested on execution and compelled by imprisonment to assign his property, if he had any, to his creditors; but the process was somewhat troublesome, and the assignment of property might be made to other creditors than the judgment creditor, and this process could not be used against a corporation or a debtor who was not found within the Commonwealth. As attachment on mesne process prevailed in this Commonwealth, the Legislature, following the analogy of trustee process in creating this new remedy for the collection of a debt, did not require that the debt should be reduced to a judgment, and that all legal remedies should be exhausted.

In 1847, in *Grew* v. *Breed,* 12 Met. 363, 369, this court in effect decided that in equity a promissory note could be sequestered and applied to the payment of a decree for money rendered against the owner of the note in a suit in equity, brought under the Rev. Sts. c. 36, §§ 31, 32, and it was suggested that the same remedy could be employed in courts of general equity jurisdiction to satisfy judgments for money obtained at law, if the execution had been returned unsatisfied. The bill in that case was regarded as ancillary to the original suit, and within the jurisdiction under which that had been brought; but jurisdiction to maintain bills to satisfy judgments at law, by sequestering or taking property which could not be taken at law, did not exist

· until the passage of the statute of 1851, which gave a remedy to a creditor whether the debt was or was not reduced to a judgment. After the statute giving full equity jurisdiction to this court was enacted, it was held that it did not affect the jurisdiction conferred by the St. of 1851, c. 206, as amended by the St. of 1858, c. 34; but the general equity jurisdiction over suits to collect a judgment obtained at law by reaching property which could not be taken on execution was not much considered. Ultimately it was decided that the two jurisdictions were not in all respects identical as to the property that could be reached, and the St. of 1884, c. 285, was passed. *Barry* v. *Abbot*, 100 Mass. 396. *Tucker* v. *McDonald*, 105 Mass. 423. *Phœnix Ins. Co.* v. *Abbott*, 127 Mass. 558. *Carver* v. *Peck*, 131 Mass. 291. *Ager* v. *Murray*, 105 U. S. 126.

It must be admitted that the extent to which choses in action can be taken by a court of equity, acting under its general powers without the aid of statutes, is not very well defined; and it is said that in England a chose in action cannot be taken " where the individual in whose hands it is disputes either the amount, or the title of the party whose property is sequestered." It seems that the legal choses in action actually taken under this general equity power have been debts for definite sums of money. 2 Dan. Ch. Pract. (5th Am. ed.) 1052, 1053. See *Hadden* v. *Spader*, 20 Johns. 554; *White* v. *Geraerdt*, 1 Edw. Ch. 336; *Greene* v. *Keene*, 14 R. I. 388. The subject is now largely regulated by statute, both in England and in the States of this country. 3 Pom. Eq. Jur. § 1415. 2 Barb. Ch. Pract. (2d ed.) 147 *et seq.* Evans Pract. of Ch. Div. 356 *et seq.* Morgan Ch. Acts and Orders, (6th ed.) 455 *et seq.*

Without considering such intangible property as letters patent, copyrights, and the right to a seat in an exchange, or equitable interests in property, and speaking only of legal choses in action, it may be said that, so far as our knowledge extends, the choses in action that under the various statutes have been taken and applied to the payment of debts have been themselves debts due or to become due, although not always debts for definite sums of money. Perhaps *Hudson* v. *Plets*, 11 Paige, 180, is an exception; but that decision, whether right or not, does not help the plaintiff's case. The word " debt," even in its broadest sig-

nification, implies that the consideration of the obligation of the debtor has been executed on the part of the creditor, and the payment of the debt discharges the obligation. The execution of the agreement described in the bill did not make the defendants debtors of the railroad company. The obligations created by the agreement were executory on both sides, and were mutual.

It is no objection to this bill that the principal debtor is a foreign corporation, not having a usual place of business in the Commonwealth, and that no service had been made or could be made upon it which would enable the court to render a decree that it would be bound to perform, unless it is essential to the plaintiffs' case that they obtain an assignment of the agreement from the railroad company. The cases are numerous where debts due from inhabitants of this Commonwealth to non-residents have been attached by this process, and it was to reach the property of non-residents that the statute of 1851 was passed. *McCann* v. *Randall*, 147 Mass. 81. The language of the statute is undoubtedly broad; it is, "Any property, right, title, or interest, legal or equitable, of such debtor." No case, however, appears in our reports where under this process a plaintiff has been permitted to compel a debtor to execute on his part an executory contract made with other persons, or has been permitted to execute it for him in order that the plaintiff may compel these other persons to perform their part of the contract for the benefit of the plaintiff; neither has any claim for unliquidated damages for the breach of an executory contract been reached and applied under this procedure.

We think that a negative test of the meaning of the general words of the statute is, that they cannot be held to include choses in action which from their nature could not be assigned by the debtor. The agreement between the railroad company and the defendants in this case is one which the railroad company could not assign to the plaintiffs, so as to substitute them for it as a contracting party. The defendants, as holders of the first mortgage bonds, had an interest in enabling the railroad company to complete its railroad, and an agreement by the defendants to advance money to the railroad company for this purpose could not be transferred by the railroad company to the plaintiffs, so that the defendants could be compelled to

pay the money to them, even although they were ready to deliver the bonds which the railroad company had agreed to deliver. To accomplish this would require a novation.

If, then, the railroad company were a party to this suit, the court would not compel it to make an assignment of the agreement against the will of these defendants, because it would not recognize as valid such an assignment after it had been made. The railroad company's interest in the contract, therefore, cannot be sold or assigned, and the defendants cannot be compelled to receive the plaintiffs in place of the railroad company as the party to whom they are bound.

It may be suggested that the bill shows that there has been a breach of the agreement by the defendants, in not paying the sums of money called for by the railroad company, and that, although the plaintiffs may not be able to enforce this agreement specifically against the defendants, they may have a right to reach and apply the damages which the railroad company could recover for the breach, to the extent at least of the indebtedness of the railroad company to them. It may be argued that a claim for unliquidated damages for the breach of an executory contract may be assigned in equity, and that such a chose in action can be reached by this process. We have been shown no case in which this has been done, and the difficulties are great. Such a proceeding would involve a trial of the whole cause of action of the railroad company against these defendants for the breach relied on, and entire damages must be assessed, even although they exceed the indebtedness of the railroad company to the plaintiffs. If a receiver were appointed, it may be that he could be empowered to bring such a suit, but it is, to say the least, doubtful whether the court has authority to appoint a receiver of the property of a foreign corporation, which has not appeared in the suit and is not subject to the jurisdiction of the court.

It is enough, however, to say, that the bill was not drawn for the purpose of reaching any such claim for unliquidated damages, and the many questions which would arise upon a bill so drawn have not been argued, and need not be considered.

*Demurrers sustained.*