UNITED STATES SMELTING CO. (PICHER LEAD CO., Interveners) v. HOFKIN et al.

(District Court, E. D. Pennsylvania.    November 18, 1919.)

No. 1703.

CORPORATIONS ⬦⟜334—LIABILITY OF DIRECTORS FOR PAYING UNWARRANTED DIVIDEND.

Under Act Pa. April 29, 1874 (P. L. 102) § 39, cl. 5, providing that directors shall be liable for the debts of the corporation, if they declare and cause to be paid a dividend when the corporation is insolvent, or the payment of which renders it insolvent, directors of a manufacturing corporation, who were also the stockholders, who after 19 months of business declared and paid a first dividend of 500 per cent., *held* liable for debts of the corporation, which almost immediately afterward became insolvent, with large indebtedness, although at the time it had ample assets remaining to pay its then indebtedness, where its subsequent indebtedness arose out of contracts then in existence for purchase of raw material, and was caused by a large decline in its market price.

In Equity.   Suit by the United States Smelting Company against Mendel Hofkin and others, in which the Picher Lead Company and others sought to intervene as plaintiffs.   Decree for complainant.

See, also, 245 Fed. 896.

R. Stuart Smith, of Philadelphia, Pa., Philip W. Russell, of New York City, and Morgan, Lewis & Bockius, of Philadelphia, Pa., for plaintiff.

A. L. Moise, of Philadelphia, Pa., for intervener Picher Lead Co.

Carr & Steinmetz, of Philadelphia, Pa., for interveners Canada Metal Co. and Adam Hope & Co.

Alfred Aarons and Francis Shunk Brown, of Philadelphia, Pa., for defendants.

DICKINSON, District Judge.   This case, in almost every one of its varying aspects, suggests to the mind the inspired saying that "it is the letter which killeth," and in some of its aspects the contrasted effects of discarding the letter and being guided alone by the spirit, which gives life to the words of the law.   However helpful the quoted phrase may be, because of the wisdom embalmed within it, the lawyer mind is at once admonished that in this case it is the letter to which is due in the beginning all the life which the cause has.   This is so, for the reason that, if it were not for the statute, the plaintiff would have no cause of action against these defendants, and we can only know the law which the statute declares from the words employed.

The argument which leads us to disregard the letter of this statute in consequence takes on the appearance of being suicidal.   Every line of thought which, by its logical strength, draws us to a conclusion must

⬦⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

have a beginning and a starting post to which it can be tied. In this case we have for such beginning the proposition that the defendants were not as individuals the debtors of the plaintiff, nor did they become such from the mere fact that they were the directors of the corporation. If they are now or at any time became debtors, it was not nor is because they were the directors of the debtor company, but because of the provisions of the Pennsylvania statute of April 29, 1874 (P. L. 102, § 39, cl. 5), to the effect that directors shall be liable for the debts of the corporation, if they declare and cause to be paid a dividend when the corporation is insolvent, or the payment of which renders it insolvent. No question is raised over the defendants being within the statute or its application.

The real question involved is presented in the statement of counsel for defendants as one of whether the corporation was at the time of the declaring and payment of this dividend insolvent, or became insolvent as a consequence of such payment. The same question may be differently stated as one of whether the defendants, by the declaration and payment of this dividend, did that thing for which the statute visits upon them liability for the debts of the corporation. We will, because of this concession of the defendants, confine our inquiries to this question.

The facts, baldly stated, are as follows: The American Galvanizing Company had a capital stock of $10,000. The company had been in existence for about 19 months, and was yet to declare its first dividend. It entered into a number of contracts, which began to mature and ripen into debt obligations presently payable about the time the dividend was paid, or very shortly thereafter. The dividend declared, expressed in percentage, was a 500 per cent. dividend. Almost immediately afterwards the company by the act of these same directors, was declared to be insolvent. The conditions then presented were that each stockholder had withdrawn from the assets of the company in this one and only dividend five times what he had invested in it, and there was nothing left for creditors, and all its debts must go unpaid. Add to this the two facts that this total dearth of assets to meet debts followed immediately upon the payment of the dividend, and that the persons who received the dividend were the same individuals who, as directors, had declared it, and at once and by a resistless impulse the face of the inquirer is turned to these directors for some explanation of their conduct, in the absence of which the inference so plainly indicated would force itself upon the mind.

Those who have learned the risk of bad judgment incurred in forming that kind of hasty judgment known as judging from appearances will have in mind the fallacy which is voiced in the phrase "post hoc propter hoc." Chronological following, no matter how close, may not be causal consequence, but may be easily mistaken for it. It is no employment of an exaggerated figure of speech, however, to say, as to this occurrence, that not merely insolvency, but the stripping of this corporation of all assets, followed the payment of this dividend, as the thunder clap follows the electric flash.

Without something more appearing than what is above stated, the

mind is staggered into an incapacity to entertain any other inference than that which would be drawn. We cannot, in consequence, do other-. wise than feel that an explanation is not only looked for; it is imperatively demanded of the directors. This necessity is, of course, felt by the defendants and their counsel, and the explanation is forthcoming. To do it no more than justice, it is not only plausible but does not have the appearance of being the least bit strained. It is, although not expressed by counsel in quite this way, that the defendants have been placed in a false light through a chain of unfortunate, yet altogether unforeseen, happenings which were in fact merely coincidences.

Before the declaration and payment of this dividend the corporation had done a prosperous business, and at that time was in a prosperous condition. It had net assets, including the contributions to its capital, valued at $71,134.99, and a surplus applicable to the payment of dividends of $58,940.85. There is nothing to impeach the integrity of this statement of its financial condition, although, of course, its plant (and properly so) in this balance sheet summary was put at its value as a going concern, and not at its liquidating value as a bankrupt venture. It had outstanding contracts for the purchase of spelter, the raw material which it used in its manufacturing processes. These contracts proved the undoing of the company, as the drop in the price of spelter, which followed the making of the contracts to purchase, entailed a destructive loss upon the purchaser.

It is urged with earnestness, however, that at the time the dividend was declared there was not only nothing to indicate the imminence of a loss, but, on the contrary, much to found the expectation of a profit from these contracts, because the trend of the market prices of spelter was at that time upward. The facts affecting this phase of the inquiry were not sufficiently developed to enable us to make any definite findings. This is because the plaintiff was seeking to get the facts through the cross-examining of the defendants, and proceeded with a noticeable wariness, and the defendants' trial tactics were (as they would be expected to be) dictated by the policy of imposing upon plaintiff the burden of proving its case.

It is not wholly clear whether the purchases of spelter, in the quantities in which it was bought, were speculative or for manufacturing uses, nor is it by any means clear what the promise of the market as to future ranges of prices was at the time the dividend was declared. The plaintiff was in position, however, to have made this last-mentioned feature entirely clear, and, as it had failed to do so, the defendants have a right to the finding (which is now made) that there is no evidence of the price of spelter being below the contract price at the dividend date. The market was, however, so feverish and fluctuating, and the general conditions such, that there could not be said to be any stable market, and the difficulties of securing supplies so great that there was uncertainty in respect to future market conditions affecting the supply and price of spelter, and an even greater uncertainty respecting the prospects of the manufacturing business in which the corporation was engaged. The debts of the company then presently demandable did not exceed $2,200 in amount. The total indebtedness at the time of bank-

ruptcy, a few months afterwards, was many thousands, but none of this (beyond the $2,200) had on the dividend date matured into a presently payable debt, and existed only in the form of obligations resting upon executory contracts in the form of purchases of spelter for future delivery.

The legal proposition upon which, as counsel for defendants view this case, the plaintiff must recover, if at all, is that directors of a corporation cannot, except at the risk of making themselves individually liable for its debts, declare a dividend, if at the time the corporation has outstanding executory contracts carrying a monetary obligation. If this be a correct statement of the legal proposition involved in this case, it is clear that the bill must be dismissed. No such measure of responsibility can be placed upon directors consistently with a wise policy of the law, nor (and because of the unwisdom of such a law) is this the law of Pennsylvania. The words of this act of assembly carry no such meaning, nor is such a meaning in accord with the purpose of the law. That purpose is manifest. It is that the assets of corporations which belong to its creditors shall not in fraud of creditors be diverted by directors to the pockets of the stockholders, and most emphatically not to their own pockets. To assure the accomplishment of this purpose, directors are made responsible to creditors who are thus defrauded.

If there be actual fraud, it need not be stated that the transaction is within the act of assembly. The law has a further purpose, however, to formulate and enforce a policy which may extend its provisions to cases beyond those of actual fraud. The measure of responsibility visited upon directors can be more readily sensed than expressed in a formulated rule of conduct. Inasmuch as this is true, and because it is true, no honest director need be troubled with doubts whether he should favor or protest the declaration of a dividend. If to buttress his sense of what is right and to fortify his position he seeks supporting reasons, he may resort to the following test as one which may be applied:

No board of directors by the declaration of a dividend insures the solvency of the corporation. Such directors are held in the discharge of their duty only to the standard of the bona fide exercise of their best judgments. A bona fide judgment, however, carries the thought that it is a reasonably informed and intelligent judgment, in the sense that it is such a judgment as may fairly be expected to be exercised by those who assume the responsibilities of acting as directors of such a corporation. Even the possession of such a judgment is not absolutely and conclusively presumed, but such prima facie presumption is justified until removed by some explanation which the special conditions surrounding the transaction or the particular situation affecting an individual director affords.

Again, the line which separates a bona fide from a mala fide judgment is one which from necessity must be drawn after the event. Indeed, as it is a line formed, or at least indicated, by the motives and intentions of the actor, we rarely can have other evidence of it than the effects and consequences of what was done. At least the line must be drawn

in the light of results. Every director is presumed to know, because he must know, that the right of stockholders to dividends is subordinated to the rights of creditors. The right of the one does not begin until the rights of the other are assured. This, of course, does not mean an absolute assurance; but it does mean a reasonably well founded business expectation that the obligations of the corporation will be met. The financial condition of the corporation enters into it; there also enters the distinction between obligations which are presently payable debts or which time alone will ripen into debts and contingent obligations or executory contracts out of which no debt is expected to arise otherwise than as a possibility more or less remote. The reasonable expectations of those concerned, springing from the usual and ordinary, and in this sense regular, course of doing business by corporations generally, or by corporations of such general class or the particular corporation concerned, likewise enters into the problem.

This latter consideration is pertinent, because it has a bearing, and important bearing, upon the ruling to be made in this case. Ordinarily, the interests of stockholders are regarded as investments made in expectation of income to be derived therefrom. This does not apply so much to corporations which are partnerships in everything, except that letters patent have been issued to them, yet it is generally true that such interests are regarded as permanent investments, from which the holders look only for a return in dividends, and not a repayment of the capital investment. Corporations usually adopt the policy of determining what dividends they will be able to pay with more or less regularity and declare these periodically, disposing of abnormal earnings through the declaration of special or extra dividends.

Applying the thought, which we have in mind, to a concrete case, as the best means of giving it clear expression, there would be less to challenge attention to the propriety of the declaration of a dividend which was a rate of dividend no more than a normal investment return, and which was the dividend which the corporation had been regularly declaring, than in declaring a first dividend, or one of an abnormal rate, or one which was disproportioned to the dividend which had been before regularly declared. The one would call for so little scrutiny of the condition of the corporation that, if nothing appeared to indicate that the accumulated earnings were needed or might be required to pay debts, something more than a mistake of judgment must be shown before directors would be held responsible to creditors. In the case, however, of the payment of a first and unexpected dividend, of an abnormal rate out of all proportion to investment returns, and which stripped the corporation of all its capital resources, except such as were permanently tied up in plant and equipment, if this dividend payment were almost immediately followed by rank insolvency, and to crown all, if the dividend had gone to the directors who declared it, the creditors whose claims were left unpaid might well ask why the dividend had been paid and the debts not.

The fact conditions of this case make this query irrepressible. The only explanation forthcoming is that the balance sheet showed surplus earnings justifying the payment of a dividend. This is, as stated,

justification for the payment of a dividend; but the query recurs: Why was this particular dividend paid? This presents the two dividend situations above contrasted. Had this dividend been the customary one; had it been, although the first, representing a return on the capital invested, a normal dividend; had it been limited to a distribution of surplus earnings, which could be paid out without crippling the resources of the company; or had it been paid out to stockholders who were not themselves directors—the declaration might have been passed without comment.

Instead of any of these things being true of this dividend, the exact converse was true. It was the first and only dividend; it was at the rate of 500 per cent., and many times what could have been within the reasonable expectation of any stockholder; it left the resources of the company so crippled that it succumbed within almost a few days to the first demand made upon it, and became hopelessly insolvent and almost without assets, and the dividend was declared for the benefit of the very directors who declared it. The explanation given is not a satisfying answer to the inquiry of why such a dividend, having such immediately disastrous consequences, was declared, nor justifies the directors in bringing it about that they should, as has been said, be paid five times their contributions to the capital stock of the company, and that its creditors go unpaid.

Counsel for defendants, appreciating the insufficiency of this answer, fall back upon a denial of the legal liability of the directors. The view advanced is that liability is limited to creditors, and visited only if the company be insolvent when the dividend is declared, or be made so by its payment. It is this position which suggests the distinction between the letter and spirit of laws, and provoked the comment first made. If the strict letter of this statute controls, then these defendants are not liable. In one strictly literal sense the company was not insolvent, and in an absurdly literal sense the payment of the dividend did not render it so. It was not insolvent in the sense that there were any presently demandable debts which could not have been paid; the payment of the dividend did not render it insolvent, because it would have been insolvent anyhow. This latter statement is not made to ridicule the position of the defendants, for it is not the one taken by them. The statement is made to present the thought that the words of this statute were not employed to convey the technical meaning given by the defendants to the words "debts" and "insolvent."

Those who are now creditors of the company, and who became such soon after this dividend was declared, held at that time no claim of debt, in the sense of one which they could have enforced through an action of debt, which is without exaggeration the sense which defendants contend to be the sense in which the word "debts" is used; nor was the company then insolvent in the sense of an answer to the question of when the company became insolvent. The company had at that time, however, incurred every obligation to its present creditors which it ever assumed, and was then indebted to them in the obligation sense as fully as it now is, and if the shortage of assets did not exceed the total dividend payment (which is undoubtedly the sense in which the statute employs the phrase), the payment of the dividend would have

been the act which rendered the corporation insolvent. Neither the word "debts" nor "insolvent" is restricted in its meaning to one of the technical meanings which the word has. It includes that, but also more than that.

The purpose of the act of assembly is to induce directors not to divert into the pockets of stockholders assets which are needed to pay debts, and its words must be interpreted with that thought in mind. When this is the thing which in substance they have done, if they have done it with what, in legal intendment, is with eyes open to this consequence, they must restore to creditors what has thus been taken from them.

It is to be noted that liability is not based upon guilty knowledge, and, if the statute were taken literally, liability would abide the fact of the company becoming insolvent. Here, again, however, the expression is not to be construed with verbal literalness. There must be this finding of knowledge, and this finding we make. The defendants have denied knowledge of insolvency, and this disclaimer we accept in the sense in which we understand them to have made it. They must have justified themselves in their own consciences in doing what they did, or they would not have done it.

The finding made against them involves no finding of moral turpitude, and no finding of fraud in that sense. The finding is of the facts upon which the law visits upon them a legal liability. It may be, of course, that they are victims of a coincidence. They voted to themselves $5 for every $1 they put into this venture, and as a consequence they received back their investment, with this very handsome return from it. Almost immediately afterwards the company looked for assets to pay its debts, and there were none. The latter fact may merely have followed chronologically the former, and they may have had no causal relation to each other.

The defendants have in effect so declared, and we make no finding which necessarily reflects upon them. The finding merely is that the evidence is so overwhelming that no other conclusion can be reached than of one which visits upon the defendants legal liability to the extent imposed by the law. This compulsion is voiced in the figure of speech employed in an address famous in the annals of our political history that if we find timbers shaped and formed at a different time and place and by a different workman, when joined together completely make the frame of a house or a mill, all the tenons and mortices exactly fitting, and all the lengths and proportions exactly adapted to their respective places, and not a piece too many or too few, not even the scaffolding being omitted, in such a case we find it impossible to believe these workmen did not have in mind the structure in the erection of which these timbers were afterwards used.

The thought embraced in the quotation which we have thus paraphrased thrusts itself between the very clear-cut and forcible argument of counsel for defendants and the acceptance which we would otherwise give it.

We have examined all the cases to which we have been referred, and find that, so far as they are applicable, they confirm the views

above expressed. Among those cited to us are Lockhart v. Van Alstyne, 31 Mich. 76, 18 Am. Rep. 156; Wing v. Slater, 19 R. I. 597, 35 Atl. 302, 33 L. R. A. 566; Whitney v. Barlow, 68 N. Y. 34; Jones v. Barlow, 62 N. Y. 202; Garrison v. Howe, 17 N. Y. 458; Morimura Arai & Co. v. Traeger, 11 Pa. Dist. 378; Pettibone v. Toledo, 148 Mass. 411, 19 N. E. 337, 1 L. R. A. 787; Gold v. Clyne, 134 N. Y. 262, 31 N. E. 980, 17 L. R. A. 767; Severs v. Dodson, 53 N. J. Eq. 633, 34 Atl. 7, 51 Am. St. Rep. 641; Saleno v. Neosho, 127 Mo. 627, 30 S. W. 190, 27 L. R. A. 769, 48 Am. St. Rep. 653; People v. Arguello, 37 Cal. 524; Bank v. Walton, 13 Colo. 265, 22 Pac. 440, 5 L. R. A. 765, 16 Am. St. Rep. 200; Cunningham v. Norton, 125 U. S. 77, 8 Sup. Ct. 804, 31 L. Ed. 624; Levan's Appeal, 112 Pa. 294, 3 Atl. 804—to which may be added the opinion filed in this case on the motion to dismiss. Smelting Co. v. Hofkin (D. C.) 245 Fed. 896.

In order to give definiteness to the date of the decree made, we make none now, but leave is given counsel to submit drafts of a decree in accordance herewith.