In re Susan E. WICK, Debtor.

John R. Stoebner, Plaintiff,

v.

Susan E. Wick; Teaching Temps, Inc.; and Nichols, Kaster & Anderson, Defendants.

Bankruptcy No. 97–45270.
Adversary No. 99–4284.

United States Bankruptcy Court, D. Minnesota.

June 28, 2000.

David Harbeck, Minneapolis, MN, for Plaintiff.

Ronald Walsh, Brooklyn Park, MN, for Susan E. Wick, defendant.

Donald Nichols, Nicholas May, Minneapolis, MN, for Nichols, Kaster & Anderson, defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

NANCY C. DREHER, Bankruptcy Judge.

The above-entitled matter came on for trial before the undersigned on the 25th and 27th days of April, 2000. David Harbeck appeared for Plaintiff; Ronald Walsh for Defendant Susan E. Wick; Donald Nichols and Nicholas May for Defendant Nichols, Kaster & Anderson. The Court has reviewed the evidence and heard the arguments and hereby makes the following:

### Findings of Fact[1]

In 1981, Debtor, Susan Wick ("Wick"), began doing business as a sole proprietor placing temporary workers in teaching positions in the Twin Cities. Some time later, she incorporated this business as Administrative Associates International, Inc. ("AAI"), which also used the trade name "Teaching Temps." In 1995 and 1996, Wick became ill and, as a result of this illness, AAI encountered financial difficulties. Wick needed funding to keep the business afloat.

In late March, 1997, AAT entered into a purchase agreement with Valley Townhouse Maintenance, Inc. ("VTM"), a corporation owned solely by Joseph Noonan ("Noonan"), whereby VTM agreed to purchase the intangible assets of AAI for $35,000. VTM later changed its name to Teaching Temps, Inc. ("TTI"). Wick used the proceeds of the sale to pay her debt to the IRS arising from AAI's financial problems. Contemporaneously, Wick entered into an Employment Agreement with VTM which provided: "Upon Employee's completion of one year of continuous employment with Employer, in consideration of Employee's services to Employer (and no other consideration), Employee shall have an option (the 'First Option'), exercisable for 30 days, to require employer to issue such number of shares of Common Stock of Employer as shall give Employee a 24.5% ownership interest (after giving effect to the exercise of the First Option)

1. The parties stipulated to many of the following factual findings and the admissibility of all exhibits and depositions.

in Employer …." (the stock option). Pursuant to paragraph 5(a) of the Employment Agreement, Wick was entitled to exercise that option, provided that she "execute and deliver to employer a Subscription Agreement (and such other documents as may be reasonably required), in form and content satisfactory to employer's legal counsel." There were no other conditions on Wick's entitlement to exercise her option and receive a 24.5% interest in TTI. She was not required to pay any money to TTI in order to exercise her option.

On July 29, 1997, exactly four months after signing the employment agreement, Wick filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code. Plaintiff ("Trustee") was appointed Chapter 7 Trustee. In Schedule B filed with the Bankruptcy Court, Wick listed the following asset: "Potential right to receive percentage interest in Teaching Temps, Inc. under employment agreement" and stated its current market value as "Unknown." On Schedule C Wick claimed the federal exemptions. This same interest in TTI was listed on debtor's Schedule C and specifically claimed exempt under 11 U.S.C. § 522(d)(5). Both the value of the claimed exemption and the current market value of this asset were listed as "unknown." Given the dollar limitations then applicable and the other items claimed as exempt under § 522(d)(5), Wick was entitled to claim her potential interest in TTI up to a value of $3,925.

Wick appeared at her § 341 creditors meeting on September 2, 1997. There she truthfully testified that she owned the stock option in TTI. As requested at the creditors meeting, by letter dated September 15, 1997, Wick provided the Trustee with a copy of the Employment Agreement.

The Trustee did not object to Wick's exemption claims, and on November 4, 1997, Wick received her bankruptcy discharge.

After filing her Chapter 7 bankruptcy petition, Wick completed the remaining eight months of employment at TTI so as to fully vest her stock option right to 24.5% of the TTI common stock. By letter dated April 21, 1998, Wick timely wrote to Noonan formally exercising her stock option. There followed considerable back-and-forth between Wick and her counsel, on the one hand, and Noonan and his counsel, on the other, in furtherance of documenting the transaction. In May 1998, Noonan forwarded to Wick for her review drafts of a Buy–Sell Agreement, Stock Certificate, and Stock Subscription Agreement. Wick, in turn, forwarded the Buy–Sell Agreement to her own attorney for legal advice. Part of the delay resulted when a dispute arose between Wick and Noonan regarding the number of shares Wick would receive as a result of exercising her option. Noonan believed the amount of shares should be 324 and Wick believed the number of shares should be 245. Inexplicably, Wick argued for a lesser number.

On July 6, 1998, Trustee's counsel wrote to Wick's bankruptcy attorney asking, *inter alia*, whether debtor was still employed by TTI and whether debtor had exercised her stock option rights. The letter sought to determine whether the option, if exercised, exceeded the sum of $3,925, her remaining "wild card" exemption.

On July 13, 1998, Wick's bankruptcy counsel forwarded the letter to Wick. On the same day, Wick and Noonan had a confrontation as a result of which she concluded, in her own mind, that she had been terminated, and Noonan concluded, in his own mind, that she had not. She and Noonan had for some time earlier been lovers, but by this time Noonan had a new girlfriend, and Wick believed their personal relationship was over. As a result of this confrontation and, in addition, comments Noonan had made to her earlier, Wick felt she might have difficulty getting Noonan to deliver her stock certificates.

However, in actuality, neither Noonan nor his counsel had affirmatively rejected her exercise of the option at that time. In fact, the Buy–Sell Agreement was still being negotiated between them.

On July 16, 1998, Wick sent a letter to the Trustee's counsel stating

In response to your inquiry dated July 6, 1998. I am no longer employed by Teaching Temps, Inc. My employment ended July 9, 1998. *I attempted to exercise my stock option in April, 1998 and was denied. The corporation's unwillingness to issue my stock was one of the key issues relating to my dismissal last week.*

While at the time Wick may have believed she had been terminated, she certainly knew that she had never been "denied" her stock option and that her failure to have her stock in hand was not connected to her "dismissal," if that is what she thought occurred. In fact, she knew that she was an extremely important person in running the business, that Noonan needed her to keep the business going, and that she had a clear cut right to a 24.5% ownership interest in the company. Moreover, if not intentionally deceptive when made, her statements became almost immediately thereafter untrue and seriously deceptive.

The same day, July 16, or soon thereafter, Wick and Noonan attended counseling in an attempt to salvage their business relationship. The mediation was successful. Wick returned to work at TTI within a few days, and TTI issued her a paycheck for the time between July 13 and her return to work. Sometime during this period Wick mentioned to Noonan that she had "dodged a bullet" when she responded to the Trustee's letter. She continued working with the company until September 28, 1998, when, as a result of yet another flare-up between former lovers, Noonan fired her.

By letter dated August 11, 1998, however, Wick had written Noonan requesting, among other things, the issuance of her stock and a final draft of the Buy–Sell Agreement. On September 8, 1998, Wick received her stock certificate representing twenty four and one-half percent (24.5%) of the common stock of TTI. The stock certificates did not include a restrictive endorsement limiting the right to resell, although that was part of the agreement. Wick had no objection to any of the provisions of the Buy–Sell Agreement; however, Wick responded that she was "too busy" to deal with the Buy–Sell Agreement as September is TTI's busiest time of the year, but she agreed to respond in due course. Wick never executed the Buy–Sell Agreement because she was terminated by Noonan shortly thereafter.

In early October 1998, Wick initiated a state court action against Noonan and TTI for a variety of claims and sought a temporary restraining order excluding Noonan from TTI's offices and to obtain a court-ordered buy-out of her TTI stock pursuant to Minn.Stat. § 302A.751. In this action she actually claimed to own all of the company. She based this claim on Noonan's alleged breach of contract, breach of fiduciary duties, and her claim that he had physically assaulted her, all of which gave rise to her request for a forced buyout.

On October 23, 1998, Wick's Chapter 7 case was closed. To this point in time and as a direct result of Wick's letter of July 16 and her failure to update the Trustee on the true state of affairs, even though she knew the Trustee had an interest, the Trustee was led to believe that Wick's exemption had been properly claimed.

On December 21, 1998, Wick retained defendant, Nichols, Kaster & Anderson ("NKA") to pursue her state court action. NKA entered into a contingent fee agreement with Wick which was to give the firm 45% of any recovery in the state court action, plus any costs expended by the firm. Thereafter, NKA spent considerable effort in pursuing her case.

On February 26, 1999, soon after learning of Wick's true interest in TTI, the Trustee advised Wick's attorneys, the at-

torney for TTI and Noonan, and the state trial court of his claim to the value of Wick's stock ownership interest in TTI, to the extent such value exceeded $3,925.00. The Trustee did not, however, participate in the trial.

In March of 1999, the state court action was tried over a period of six days in Hennepin County District Court. On May 20, 1999, the state trial court issued Findings of Fact, Conclusions of Law, and Order. Essentially, the court found a forced buyout to be appropriate. The court also made several findings having to do with the credibility of Wick and Noonan both of whom he found to be, at times, lacking in credibility. The court concluded that, as of December 31, 1998, TTI had a fair market value of $396,900 ($630,000 × 30% minority discount = $441.00 (sic) × 10% marketability discount = $396,900). It also concluded that Wick's 24.5% share of TTI is $97,240.05 rounded to $97,200. That valuation sided with evidence presented by Noonan and rejected expert evidence presented by Wick to a much higher valuation. It is clear, however, from the state court findings that the state court took into consideration the fact that Wick's shares were in a closely held company and thus needed to be valued at a low value for low marketability. The court ordered a forced dissolution of TTI and required TTI to pay Debtor $97,200 to buy her out. Noonan and TTI appealed the decision.

The Trustee, after becoming aware of the trial court's order, contacted debtor's bankruptcy counsel by letter dated July 19, 1998 and demanded turnover of the value of debtor's TTI stock less the $3,925.00 available under 11 U.S.C. § 522(d)(5). Debtor's attorney responded by letter dated July 22, 1999, stating:

> Thank you for your letter of July 19th. It is my client's position that the value of the option and therefore the judgment that has been entered accrued primarily in the year following the filing of the bankruptcy. It is only as a result of my client's services and the passage of time

that this corporation had any value. *Therefore it is our position that the value of this option was substantially less on the date of the filing of the bankruptcy and that we have claimed the majority of it as exempt.* It is our position that the estate has a minimal, at best, interest in that option.

Wick was copied on the letter. Nonetheless, she testified at this trial that her counsel did not have her authority to make such a statement.

On August 5, 1999, the Trustee filed the present adversary proceeding, seeking turnover under 11 U.S.C. § 542 of the proceeds of the stock option from Wick. The Trustee named both NKA and TTI as defendants in the event they possessed the proceeds from the sale of the resulting stock. The Answers of all three defendants generally denied the allegations of the Complaint and asserted normal "boilerplate defenses," none of which defenses were seriously pursued at trial. Importantly, NKA sought no affirmative relief and asserted no counterclaim. Wick specifically asserted that the property was no longer property of the estate because the Trustee had failed to object to her exemption claim, that the value of the stock option at the date of filing was less than $3,925.00, and that any postpetition appreciation was the result of Wick's postpetition employment and not property of the estate. Wick also asserted that the asset, even if property of the estate, had been abandoned pursuant to § 554(c) of the Code when the case was closed on October 23, 1998 without the Trustee having administered it. Debtor sought a determination that the sums awarded to her in the state court proceeding were not property of the estate. Without stating any basis for seeking the same, she also sought to be paid her attorneys' fees and expenses incurred in litigating this adversary proceeding, a claim which she has also not seriously pursued.

Prior to trial I denied Wick's motion for summary judgment in which she asserted that the Trustee had waived any right to object to her exemption by not having objected to her claim within 30 days of the conclusion of the meeting of creditors.

Soon before trial, Wick, Noonan, and TTI settled the state court litigation. Under the settlement, TTI agreed to turn over to the Trustee the sums awarded to Wick in the state court action, which the Trustee would hold in trust pending resolution of this case. Pursuant to the agreement, TTI was dismissed from this case with prejudice, but NKA was not. Prior to trial, the Trustee moved to dismiss NKA as a Defendant, asserting that NKA, which had only been named as a Defendant because of TTI's refusal to turn over, should likewise be dismissed. This motion was withdrawn at the commencement of trial.

## CONCLUSIONS OF LAW

The question is this: what is the estate's interest in the cash proceeds of a stock option partially vested at the date of filing where the debtor claims the asset exempt under the federal "wild card" provision and asserts the value is "unknown" *and* the trustee fails to object to the claim within 30 days of the conclusion of the meeting of creditors. The peculiar facts of this case present an apparent issue of first impression in this circuit that requires the court to consider the interaction between various provisions of the Bankruptcy Code, certain of the Federal Rules of Bankruptcy Procedure, and a Supreme Court decision.

First implicated are the Code provisions dealing with property of the estate, including § 541(a)(1), which broadly defines property of the estate to include all interests the debtor has in property as of the commencement of the case; § 541(a)(6), which includes in the estate proceeds of property of the estate, except postpetition earnings; and § 541(a)(7), which includes property the estate acquires postpetition.

Also implicated are the exemption provisions. Specifically at issue is the debtor's wild card exemption at § 522(d)(5), which, at the time of Wick's petition, allowed the debtor to exempt "the debtor's aggregate interest in any property, not to exceed in value $800 plus up to $7,500 of an unused amount of the [homestead exemption]." In connection therewith, the court must consider § 522(a)(2), which provides that value means "fair market value as of the date of the filing of the petition or, with respect to property that becomes property of the estate after such date, as of the date such property becomes property of the estate."

Because the Trustee did not object to the exemption, § 522(*l*) and Federal Rule of Bankruptcy Procedure 4003 come into play. Section 522(*l*) provides that unless a party in interest objects, property claimed exempt is exempt. Rule 4003 requires an objection within 30 days following the meeting of creditors. The lack of an objection also requires the court to consider the impact of the Supreme Court decision in *Taylor v. Freeland & Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992), which the debtor vigorously asserts applies to this case, but which in fact does not.

As discussed below, other courts have dealt with and settled various issues arising out of these provisions, but there is precious little, if any, authority factually and directly on point. Circuit authority in this area is scant.

### I. PROPERTY OF THE ESTATE

Section 541 of the Bankruptcy Code provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1994). The scope of this provision is very broad and includes property of all descriptions. *Whetzal v. Alderson,* 32 F.3d 1302, 1303 (8th Cir.1994). Every conceivable interest of debtor, future, non-possessory, contingent, speculative, and

derivative, is within the reach of this statutory provision. *In re Yonikus*, 996 F.2d 866, 869 (7th Cir.1993); *Potter v. Drewes (In re Potter )*, 228 B.R. 422, 424 (8th Cir. BAP 1999). Therefore, contract rights, even if they are contingent on some future event, become property of the estate. *See Allen v. Levey (In re Allen )*, 226 B.R. 857, 864–66 (Bankr.N.D.Ill.1998).

■ The specific interest in property held by Wick at the commencement of the case was a contract right to receive stock in TTI, contingent upon Wick completing one year of employment. Wick's stock option was nothing more than a contract right contingent on a future event. *See Allen*, 226 B.R. at 864–66. It makes no difference that the contingency required postpetition services. *Id.* at 865–66. Accordingly, the option became property of the estate upon the filing of Wick's petition. *Id.*

■ However, Wick's option no longer exists. She completed one year of employment with TTI and converted the option to stock. Following the state court litigation, she received $97,200 for that stock. Therefore, what now exists are the proceeds of the resulting stock.

Section 541(a)(6) provides that "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case" are property of the estate. 11 U.S.C. § 541(a)(6). In the same vein, § 541(a)(7) provides that property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). Pursuant to these provisions, the stock resulting from the option

and, subsequently, the proceeds thereof became property of the estate. *In re Wiczek–Spaulding*, 223 B.R. 538, 541 (Bankr. D.Minn.1998).[2]

This case presents a further complication. The option had not fully vested at the time of the petition. Wick had only worked four months of the one year required before she could exercise the option. Thus, a portion of the value of the option, and the resulting proceeds, was attributable to Wick's postpetition services.

■ The extent of the estate's interest in an asset cannot exceed the interest possessed by the debtor at the commencement of the case. *Allen*, 226 B.R. at 867. The realized value of an interest that was contingent at the time of filing is property of the estate only to the extent that the subsequently realized value is related to prepetition actions of the debtor. *Allen*, 226 B.R. at 867. Therefore, where stock options vest as a result of both prepetition and postpetition services, the estate's interest is the pro rata portion of the option that is related to the debtor's prepetition services. *Id.* This conclusion is in keeping with the language of § 541(a)(6) and reconciles the provision that profits and proceeds of property of the estate are property of the estate with the provision that earnings due to postpetition services of the debtor are not. *Id.* It is also consistent with the language of § 541(a)(7), which ensures that any estate interest in property acquired postpetition is property of the estate. *Id.*

■ In this case, Wick had completed four months of employment prepetition. Because the option required one year of continuous employment, ⅓ of the time re-

---

**2.** Wick argues that none of the resulting proceeds became property of the estate because they only arose as a result of Noonan's breach of fiduciary duties and Wick's action for dissolution. Such argument confuses Wick's right to the stock and her remedy for Noonan's breach. Wick had a right to the stock once the option vested after one year of employment. The estate had a ⅓ interest in that right. The estate would have retained a ⅓ interest if Wick had subsequently decided to sell the stock. The fact that Wick received the proceeds of the stock as a remedy for Noonan's breach of fiduciary duties, rather than by sale, does not affect the estate's interest therein.

quired to exercise the option had passed prepetition. Accordingly, a ⅛ interest in the option became property of the estate when Wick filed her petition. And, had the options remained unexercised, ⅛ of the postpetition appreciation would have continued to accrue to the benefit of the estate. *Potter,* 228 B.R. at 424; *Allen,* 226 B.R. at 867. As noted above, however, the option no longer exists. Thus, a ⅛ interest in the stock and a ⅛ interest in the proceeds of the stock subsequently became property of the estate. *See* 11 U.S.C. § 541(a)(6), (7); *Wiczek–Spaulding,* 223 B.R. at 541. Under § 542(a),[3] the Trustee may recover property of the estate from the debtor or persons possessing such property.

## II. Exemption

■■ A debtor can prevent distribution of certain assets that become property of the estate by claiming them as exempt. *Taylor v. Freeland & Kronz,* 503 U.S. 638, 642, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992). Wick's claimed exemption of the option raises three issues for decision: (1) what did Wick claim exempt; (2) what are the parties' respective rights to the proceeds of the option; and (3) is Wick entitled to more than the statutory limit of the exemption because the Trustee failed to object to the exemption.

■■ Bankruptcy Code § 522(*l*) requires the debtor to file a list of property that the Debtor claims as exempt. Because the time to object is relatively short, *see* Fed. R. Bankr.P. 4003(b), it is important that trustees and creditors be able to determine precisely whether a listed asset is validly exempt simply by reading a debtor's schedules. *Hyman v. Plotkin (In re Hyman),* 967 F.2d 1316, 1319 n. 6 (9th Cir.1992). Because the debtor controls the information placed on her schedules, all

ambiguities in the listing of exemptions must be construed against the debtor. *Hyman,* 967 F.2d at 1319 n. 6; *Addison v. Reavis,* 158 B.R. 53, 59 (E.D.Va.1993); *Alderman v. Martinson (In re Alderman),* 195 B.R. 106, 111 (9th Cir. BAP 1996); *In re Sherbahn,* 170 B.R. 137, 139 (Bankr. N.D.Ind.1994).

■■ Wick claimed her "Potential right to receive percentage interest in Teaching Temps, Inc. under employment agreement" as exempt pursuant to 11 U.S.C. § 522(d)(5) and listed its current market value as "Unknown." Given the dollar limitations then applicable and the other items claimed as exempt under § 522(d)(5), Wick was entitled to claim her potential interest in TTI up to a value of $3,925. It is unclear from Wick's schedules whether she was claiming the entire option as exempt or whether she was claiming it exempt up to the remaining $3,925. Such ambiguity must be construed against her. *Hyman,* 967 F.2d at 1319 (debtors did not sufficiently notify the trustee they were claiming the entire homestead as exempt when they claimed it exempt pursuant to a provision with a $45,000 limitation); *Polis v. Getaways, Inc.,* 242 B.R. 653, 656 (N.D.Ill.1998) (exemption limited to remaining amount of wildcard exemption no matter what the value ascribed to the asset in the schedules). It was logical for the Trustee to conclude, and I find, that Wick only exempted up to $3,925 of the value of the option, not the estate's entire interest in the option.

The Defendants argue that even if the exemption is limited to $3,925, the estate still has no interest in the option or its proceeds because its value was less than $3,925 on the date of the petition. The only evidence regarding the value of the option as of the petition date was present-

---

**3.** Section 542(a) provides, in pertinent part,

... an entity, other than a custodian, in possession, custody or control of property that the trustee may use, sell, or lease under § 363 of this title, or that the debtor may exempt under § 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

ed by Wick and NKA.[4] Their expert opined that the value of TTI as of July 29, 1997, was $35,000, based upon the price Noonan and TTI paid in March of 1997. Because the option allowed Wick to obtain 24.5% ownership of TTI, it was worth at most $8,575. The Defendants' expert further reduced the value of the option by 30% because it only provided for a minority interest, by 10% due to its lack of marketability, and by another 10% because it was still contingent and had not yet vested. After all of these reductions, the Defendant's expert valued the option at $4,863 as of July 29, 1997. Because the estate obtained only a ⅓ interest, the estate's interest was valued at $1,605. Thus, the Defendants assert that Wick exempted the entire value of the option on the petition date, and it dropped out of the estate.

■■■ At first glance, this argument appears to have merit. After all, § 522(a)(1) provides that "value" as used in that section means "fair market value as of the date of the filing of the petition or, with respect to property that becomes property of the estate after such date, as of the date such property becomes property of the estate." 11 U.S.C. § 522(a)(2). However, this provision merely establishes the value of the exemption, not of the asset itself.[5] The debtor's right to use the exemption comes into play not upon the filing of the petition, but only if and when the trustee attempts to sell the property.

Hyman, 967 F.2d at 1321. Thus, the value of the property in which an exemption has been claimed is determined upon the sale or other disposition of the asset. In re Sherbahn, 170 B.R. 137, 139 (Bankr. N.D.Ind.1994). Once the debtor claims an exemption with a specific dollar amount, she is bound by that amount and cannot claim the entire asset as exempt. Hyman, 967 F.2d at 1319; Polis, 242 B.R. at 656 (valuing an asset at less than statutory maximum does not cause the entire property claimed as exempt to become exempt; debtor's interest cannot exceed the remaining value of her exemptions); In re Heflin, 215 B.R. 530, 534–35 (Bankr. W.D.Mich.1997). Therefore, if, due to post-petition appreciation, the asset sells for more than the debtor's claimed exemption, the estate, rather than the debtor, is entitled to the benefit of that appreciation. Hyman, 967 F.2d at 1321; Potter, 228 B.R. at 424; Heflin, 215 B.R. at 534–35; Sherbahn, 170 B.R. at 139.

■■■ I have already determined that Wick claimed the option exempt in an amount no greater than $3,925. She did not claim the entire option as exempt. Thus, she is bound by the amount claimed exempt—$3,925. Hyman, 967 F.2d at 1321; Polis, 242 B.R. at 656; Heflin, 215 B.R. at 534–35. The option remained in the estate until such time as the trustee administered it or abandoned it.[6] First of Am. Bank v. Gaylor (In re Gaylor), 123

---

4. In his Motion in Limine, the Trustee argued that collateral estoppel precluded the Defendants from presenting any value of the business other than that determined by the state court. I considered the expert testimony because it dealt with the valuation on the date of filing, July 29, 1997. The state court found the value as of December 31, 1998. While the parties were bound by the state court's findings to the extent December 31, 1998, was the relevant date, they were not so bound if the relevant valuation date was the date of filing. In any event, the expert's testimony has become irrelevant to my decision because I find that December 31, 1998 (the date, in essence, when the property came into the estate, see 11 U.S.C. § 522(a)(2)), is the relevant date for valuation.

5. Under this reading and the evidence presented regarding the value of the option at the time of filing, Wick's exemption was actually limited to $1,605. However, the Trustee has conceded that the exemption is for $3,925.

6. Of course the trustee cannot wait around forever in hopes that the asset may increase in value. If the debtor believes she is being prejudiced by the trustee's delay, the debtor can move for the trustee to abandon the asset. Hyman, 967 F.2d at 1321 n. 11; Heflin, 215 B.R. at 535. In any event, if the case is closed without the trustee administering the asset, it is deemed abandoned. 11 U.S.C. § 554(c). This is an issue addressed in greater detail below.

B.R. 236, 240 (Bankr.E.D.Mich.1991).[7] Any increase in value of the option over and above $3,925 inured to the benefit of the estate. *Hyman,* 967 F.2d at 1321; *Potter,* 228 B.R. at 424; *Heflin,* 215 B.R. at 534–35; *Sherbahn,* 170 B.R. at 139.

▮▮▮▮▮ In this case the option did subsequently increase in value. Wick then exercised the option and, later, received proceeds from the resulting stock. As addressed above, the estate retained a ⅛ interest in each of those assets, subject to Wick's exemption. *See* 11 U.S.C. § 541(a)(6), (7); *Wiczek–Spaulding,* 223 B.R. at 541. Accordingly, the asset we are now dealing with is the proceeds of the stock, which entered the estate upon the judgment in the state court proceeding. The valuation of the exemption in this asset must be determined as of the date it entered the estate. 11 U.S.C. § 522(a)(2); *Wiczek–Spaulding,* 223 B.R. at 541. Therefore, the value of the estate's interest is ⅛ of the $97,200 value determined by the state court, or $32,400. Wick has claimed an exemption of $3,925. The remaining amount, $28,475, is not exempt and must be turned over to the Trustee.

▮▮▮▮▮ This case is further complicated by the fact that the Trustee never objected to Wick's claimed exemption. As noted above, § 522(*l*) provides that unless a party in interest objects, property claimed exempt is exempt. Federal Rule of Bankruptcy Procedure 4003(b) further provides that the "trustee ... may file objections to the list of property claimed as exempt within 30 days after the conclusion of the meeting of creditors ...." Fed. R. Bankr.P. 4003(b). By negative implica-

tion, § 522(*l*) requires that a debtor's claimed exemptions become valid upon the expiration of the 30 day deadline in the absence of any objection. *See Taylor,* 503 U.S. at 643–44, 112 S.Ct. 1644. In this case, the time for objecting to Wick's claimed exemption in the option expired on October 4, 1997. The Trustee never filed an objection. Thus, Wick's claimed exemption is valid.

The Defendants claim that, as a consequence, this case is on all fours with the Supreme Court's decision in *Taylor.*[8] In *Taylor,* the debtor claimed an exemption for proceeds from a discrimination suit which she had pending against her employer. In her schedules, the debtor described the value of the exempt property as "unknown." She did not list a statutory basis for her claimed exemption other than § 522(d) in general. During the first meeting of creditors, the debtor orally estimated that her claim was worth $90,000. In response to further inquiries from the trustee, the debtor optimistically raised her estimation to $100,000. Nevertheless, the trustee decided not to object to the claimed exemption because he doubted that the lawsuit had any value. Eventually, the debtor settled with her employer for $110,000, which resulted in a net recovery to the debtor of $71,000.

The trustee in *Taylor* then demanded that the debtor turn over the settlement proceeds as property of the estate. The debtor refused and asserted that the recovery was fully exempt. The bankruptcy court disagreed because, in its view, there was no statutory basis for the claimed

---

**7.** In *Abramowitz v. Palmer,* 999 F.2d 1274, 1276–77 (8th Cir.1993), the Eighth Circuit stated that property claimed as exempt effectively "fell out" of the estate. However, that case did not involve, and did not address, the situation where the asset claimed exempt was subsequently determined to be worth more than the allowed exemption. *See In re Shelby,* 232 B.R. 746, 762 (Bankr.W.D.Mo.1999).

**8.** The other cases cited by the Defendants are entirely inapposite. *See Abramowitz v. Palmer,*

999 F.2d 1274 (8th Cir.1993) (bankruptcy court had jurisdiction to impose constructive trust on property claimed exempt); *In re Alexander,* 239 B.R. 911 (8th Cir. BAP 1999) (trustee had 30 days after creditors' meeting in converted case to object to amended exemptions; eligibility for exemption determined on date of filing, not conversion); *In re Cochrane,* 178 B.R. 1011 (debtor cannot claim alternative exemptions under two states' laws).

exemption; the proceeds remained property of the estate, despite the trustee's failure to object to the claimed exemption. In the eventual reversal, the Supreme Court concluded that the debtor was entitled to retain all proceeds because the trustee failed to file a timely objection to the claimed exemption as required under § 522(*l*) and Rule 4003(b). The Court held that the trustee's failure to file a timely objection prevented him from belatedly challenging the validity of the exemption notwithstanding the lack of any legitimate statutory basis for the exemption. *Taylor*, 503 U.S. at 642, 112 S.Ct. 1644.

The Defendants claim that this case is identical to *Taylor* because Wick also claimed the option as exempt for unknown value. Thus, because there was no objection, the entire asset became exempt. *Taylor* is distinguishable from the facts of this case, however. The debtor in *Taylor* gave no statutory basis for her claimed exemption and listed the value as unknown. By implication, if not directly, she was claiming an exemption in the entire asset, no matter what its value. Indeed, she directly stated at the meeting of creditors that the asset had a value of at least $100,000. The facts in *Taylor* should have raised numerous red flags and should have caused the Trustee to object.

In contrast, Wick listed a valid statutory basis for her exemption. That basis contained a discrete dollar value limitation. Thus, by implication, Wick indicated that she did not intend to claim an exemption any greater than the dollar value allowed by that particular statute. This understanding was later affirmed by the letter from Wick's counsel, acknowledging that the exemption was limited in dollar amount.[9]

Unlike the debtor in *Taylor*, Wick's use of "unknown" to value the asset did not imply an intention to exempt the entire asset. At the very least, Wick's claim was ambiguous and must be construed against her.[10] *Hyman*, 967 F.2d at 1319 n. 6; *Addison*, 158 B.R. at 59; *Alderman*, 195 B.R. at 111; *Sherbahn*, 170 B.R. at 139. In such a situation, the lack of an objection does not transform the debtor's exemption from one for a specific dollar amount to one for the entire asset. *See Hyman*, 967 F.2d at 1319; *Gaylor*, 123 B.R. at 238–241.

Accordingly, the Trustee had no basis, and still has no basis, to object to Wick's claimed exemption in the option. It was both a validly claimed exemption and within the allowed dollar amount. Thus, the holding in *Taylor* that the exemption becomes valid in the absence of a timely objection is of no consequence in this case.[11] The debtor has a valid exemption up to $3,925 in any event, and the Trustee's failure to object does not allow her an exemption greater than that amount.

Furthermore, the issue at hand is the valuation of the property claimed exempt, not the validity of the exemption. The Trustee does not have, and could not have, an objection to the validity of Wick's exemption because it allows her to exempt any type of property. The cases are clear

---

9. Wick's position that her attorney was not authorized to make admissions on her behalf is belied by the fact that he was still counsel of record in her case and copied her on the letter.

10. I distinguish the decision by the Eleventh Circuit in *Green v. Allen* (*In re Green*), 31 F.3d 1098 (11th Cir.1994). In that case, the debtor listed her interest in a lawsuit as having a value of one dollar. She exempted the lawsuit for the same value. The Court found that, in doing so, the debtor exempted the entire asset. However, there is no indication in the opinion that the statutory basis for the exemption provided a dollar limitation that would make the debtor's claim ambiguous. And, it is extremely peculiar on its facts in that the trustee admitted he knew the debtor intended to claim the entire asset as exempt, but he simply failed to object. In this respect, the case is distinct from the one before me and not persuasive precedent.

11. Because of this decision, I need not address the Trustee's argument that, if *Taylor* does apply, it can be overcome through the equitable reach of § 105.

that *Taylor* only stands for the narrow proposition that the validity of an exemption cannot be contested after the deadline. Valuation of the asset can be made at any time. *Mercer v. Monzack,* 53 F.3d 1 (1st Cir.1995); *In re Salzer,* 52 F.3d 708, 711–12 (7th Cir.1995); *Seror v. Kahan,* 28 F.3d 79, 82–82 (9th Cir.1994); *Hyman,* 967 F.2d at 1320 n. 9; *Ainslie v. Grablowsky (In re Grablowsky),* 32 F.3d 562, 1994 WL 410995 (4th Cir.1994); *Alderman,* 195 B.R. at 111; *Heflin,* 215 B.R. at 534–35; *Shelby,* 232 B.R. at 764. Thus, to the extent that the Trustee objects to the valuation of the asset as within the statutory limit, such objection is not barred by *Taylor.*

III. ABANDONMENT

■ I must also determine whether the Trustee abandoned the asset when Wick's Chapter 7 case was closed on October 23, 1998.[12] Bankruptcy Code § 554(c) provides that "[u]nless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." 11 U.S.C. § 554(c). Under § 554(c) a technical abandonment is the necessary effect of the closing order, regardless of the trustee's intentions. *Woods v. Kenan (In re Woods),* 173 F.3d 770, 776 (10th Cir.1999). Thus, the Trustee technically abandoned the option when the case was closed in October of 1998.

■ Once an asset of the estate has been abandoned by the trustee, it is no longer part of the estate and is effectively beyond the reach and control of the trustee. *In re Buckner,* 224 B.R. 760, 762 (Bankr.E.D.Mo.1998); *In re Ozer,* 208 B.R. 630, 633 (Bankr.E.D.N.Y.1997). In general, abandonment is irrevocable even if the trustee subsequently discovers that the asset has a value greater than what the trustee initially believed. *Buckner,* 224

B.R. at 762; *Ozer,* 208 B.R. at 633; *Huntington Nat'l Bank v. Hunter (In re Hunter),* 76 B.R. 117, 118 (Bankr.S.D.Ohio 1987).

■ However, a technical abandonment under § 554(c) is merely a rebuttable presumption. *Woods,* 173 F.3d at 778. Exceptions to the finality of abandonment are allowed where (1) the trustee is given incomplete or false information about the asset by the debtor; (2) the debtor has failed to list the asset on the schedules and petition altogether; or (3) the trustee's abandonment was the result of a mistake or inadvertence. *Buckner,* 224 B.R. at 762; *Ozer,* 208 B.R. at 633–34; *Hunter,* 76 B.R. at 118; *see also Woods,* 173 F.3d at 776–78 (discussing differing approaches of the courts and concluding that abandonment is revocable on the basis of Federal Rule of Bankruptcy Procedure 9024 and Federal Rule of Civil Procedure 60(b)).

■ In this case the general rule that abandonment is irrevocable does not apply. Wick provided the Trustee with false and/or incomplete information regarding the option. In particular, she informed him that she was no longer employed by TTI and that her exercise of the option had been denied. While Wick may have believed at the time that she had been terminated by TTI, it is patently untrue that the stock option had been denied. Moreover, even if the statements were not intentionally deceptive when Wick wrote the letter, her statements became untrue and seriously deceptive within days thereafter when she returned to work and ultimately exercised the option. The Trustee reasonably relied upon Wick's statements when he decided to close the case and, consequently, abandon the option. Under the circumstances, it is appropriate to revoke the technical abandonment and allow the estate's share of the option to return to

12. Although raised by the Defendants in their pleadings, they did not address the abandonment issue in their pre-trial memoranda, nor argue it to any degree. The main thrust of the defendants' arguments is that this is a *Taylor* case, plain and simple.

the estate for the benefit of Wick's creditors.

IV. ATTORNEY'S FEES

 Defendant NKA requested for the first time in its pre-trial memorandum that its fees and costs be paid out of the stock proceeds even to the extent such proceeds are property of the estate. In post-trial arguments, the debtor appeared to assert for the first time that, if the property is part of the estate, it comes into the estate burdened with litigation fees so extensive so as to require a forced abandonment. These issues, however, were never pleaded, nor were they tried, by consent or otherwise. NKA did not request affirmative relief in its answer to the complaint and did not file a counterclaim. The debtor never sought abandonment under 11 U.S.C. § 554(a). Thus, I do not have jurisdiction to provide NKA with the relief it requests. If NKA has a claim for its fees to be paid out of property of the estate, it may have now, or it may have had, other remedies available in the main bankruptcy case. If the debtor wishes to raise this issue, it may now have, or may have had, an alternate unpleaded or unpursued remedy. But, until such time as these issues are properly raised, I cannot decide them.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1. Judgment be entered in favor of the Trustee and against Defendant Susan Wick in the amount of $28,475.00;

2. Judgment be entered in favor of the Trustee and against Defendant Nichols, Kaster & Anderson to the extent the proceeds of the option are held by such Defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY