Massimo DENADAI, Appellant,

v.

PREFERRED CAPITAL MARKETS,
INC., and Tali Tomsic, Chapter
7 Trustee, Appellees.

No. CIV.A. 01–40073–WGY.

United States District Court,
D. Massachusetts.

Nov. 13, 2001.

Warren E. Agin, Swiggart & Agin, LLC, Boston, MA, for Massimo DeNadai.

Richard N. Gottlieb, Law Offices of Richard N. Gottlieb, Boston, MA, for trustee.

Christopher W. Parker, Ian A. Hammel, McDermott, Will & Emery, Boston, MA, for Preferred Capitol Markets.

## MEMORANDUM AND ORDER

YOUNG, Chief Judge.

Massimo DeNadai ("DeNadai") appeals the final order of the Bankruptcy Court

denying his motion for summary judgment and granting the cross-motion for summary judgment by Preferred Capital Markets, Inc. ("Preferred") and Tali Tomsic, the Chapter 7 trustee (the "Trustee"). DeNadai appeals on two grounds: (1) the Bankruptcy Court held that most of DeNadai's stock options were property of the bankruptcy estate pursuant to 11 U.S.C. § 541(a), and (2) the Bankruptcy Court held that the stock options were not exempt from the estate pursuant to 11 U.S.C. § 522(b)(2)(A). As the present appeal presents only issues of law, DeNadai seeks reversal of the order of the Bankruptcy Court.

## I. Background

### A. Procedural Posture

DeNadai filed his Chapter 7 bankruptcy petition on June 21, 2000 ("Petition Date"). Shortly thereafter, DeNadai filed a Schedule B list of personal property, which disclosed his stock options as personal property, and a Schedule C list of claimed exemptions, which declared these stock options to be excluded and exempt from the bankruptcy estate. Docket No. 6; *see also* Docket No. 16 (amended schedules).

Both Preferred and the Trustee filed objections to DeNadai's declared exemptions, Docket Nos. 28, 39, and Preferred later filed a Motion for Summary Judgment Sustaining Objections to Debtor's Exemption and Exclusion Claims, Docket No. 58. In response, DeNadai filed an objection to Preferred's summary judgment motion and included his own cross-motion for summary judgment. Docket No. 65.

Bankruptcy Judge Rosenthal consolidated the Trustee's and Preferred's objections with Preferred's motion for summary judgment, Docket Nos. 62, 63, and conducted an oral hearing on the cross-motions for summary judgment. Judge Ro-

senthal took the issues under advisement, Docket Nos. 74–76, and later issued a Memorandum of Decision and Order, which granted Preferred's motion for summary judgment and denied DeNadai's cross-motion for summary judgment. 259 B.R. 801 (Bankr.D.Mass. Mar.23, 2001). Judge Rosenthal held the following: (1) it would be premature for the court to make factual findings regarding whether DeNadai has a claim of exemption in his home (not appealed); (2) DeNadai's stock options are property of the estate, but only to the extent they were earned pre-petition (appealed); (3) DeNadai's stock options are not excluded from the bankruptcy estate as an interest in trust pursuant to 11 U.S.C. § 541(c)(2) (not appealed); (4) DeNadai's Incentive Stock Options are not exempt under 11 U.S.C. § 522(b)(2) by analogy to the fact that ERISA pension benefits are so exempt (appealed); and (5) DeNadai's options are not exempt pursuant to 11 U.S.C. § 522(b)(2) under Massachusetts law (appealed). Judge Rosenthal ordered DeNadai's options to be liquidated and divided pro rata in accordance with his written opinion. Docket No. 86.

This case comes before this Court as an appeal by DeNadai from the order of Judge Rosenthal. Docket Nos. 88, 90. This Court heard oral arguments on June 27, 2001 and took the issues under advisement. The present memorandum and order sets forth this Court's conclusions of law and corresponding order.

### B. Facts

#### 1. The Stock Options

At the time of his bankruptcy, DeNadai was working for Ziff–Davis, Inc. ("Ziff–Davis") as Vice–President of Business Operations for its ZDNet division. DeNadai Dep. at 28, *available at* J.A. Ex. 7. Effective February 13, 1998, Ziff–Davis adopted

an Amended 1998 Incentive Compensation Plan (the "Plan"). DeNadai Aff. Ex. A, *available at* J.A. Ex. 9. The purpose of the Plan was to "promote the growth and performance of Ziff–Davis ... by encouraging employees ... to acquire an ownership position in the Company through the holding of common stock ..." so that the company could "attract and retain employees ... of outstanding ability, and provid[e] such employees ... with an interest in the Company parallel to that of the Company's stockholders." *Id.* ¶ 1. All employees who "demonstrated significant management potential or who have the capacity for contributing in a substantial measure to the successful performance of the Company" were eligible to be participants of the Plan. *Id.* ¶ 3. Under the Plan, the Company could issue the following awards: stock awards, stock options (either incentive stock options ("ISOs") qualifying for special tax treatment under I.R.C. § 422, or non-qualified stock options), stock appreciation rights, performance shares, and restricted stock. *Id.* ¶ 5. Each award under the Plan was to be set forth in a separate agreement. *Id.* ¶ 6. The Plan restricted the transferability of its options, providing that "[n]o Award shall be assignable or transferable, and no right or interest of any Participant shall be subject to any lien, obligation or liability of the Participant, except by will or the laws of descent and distribution." *Id.* ¶ 8. Under certain limited circumstances, the Plan did allow transfer to immediate family members. *Id.* The Plan also limited the exercisability of the options, specifying that "[d]uring the lifetime of the Participant, stock options shall be exercisable only by the Participant or by the immedi-

ate family member or trust to whom such stock options have been transferred." *Id.*

Pursuant to the Plan, DeNadai entered into several stock option agreements in 1998 and 1999. *Id.* ¶ 4. Specifically, DeNadai entered into five stock option agreements, only three of which are relevant to this appeal. On June 24, 1998, DeNadai entered into an incentive stock option ("ISO") agreement with Ziff–Davis for the option to purchase 10,000 shares of Ziff–Davis stock [1] at an exercise price of $16.00 per share [2] ("Ziff–Davis Grant"). *Id.* Ex. B at 1. On December 21, 1998, DeNadai entered into two stock option agreements with ZDNet, one for ISOs and one for non-qualified stock options ("ZDNet Grant").[3] *Id.* Exs. C, D. The ISO agreement was for the option to purchase 79,948 shares of ZDNet stock at a purchase price of $4.29. *Id.* Ex. C at 2. The non-qualified options agreement was for the option to purchase 182,552 shares of ZDNet stock at a purchase price of $4.29. *Id.* Ex. D at 2.

All of the options rested on two contingencies: (1) vesting of the options occurred only as long as DeNadai was employed by Ziff–Davis and (2) a change in control resulted in the immediate vesting of all the options. *Id.* Ex. B at 2, 5; *id.* Ex. C at 3, 6; *id.* Ex. D at 3, 6. On October 17, 2000—four months after the Petition Date—CNET Networks, Inc. acquired Ziff–Davis. *Id.* ¶ 12. This event triggered the change of control clauses contained in both the Ziff–Davis and ZDNet stock option agreements, resulting in the immediate vesting of all of DeNadai's options. *Id.* ¶ 14. On the Petition Date, however, the stock options were subject to the following vesting schedule:

---

1. Ziff–Davis first issued stock to the public in May of 1998. DeNadai Dep. at 21–22.

2. The exercise price was later lowered to $6.00 per share. DeNadai Dep. at 62–63.

3. On March 31, 1999, Ziff–Davis issued stock to the public that tracked the performance of its ZDNet division. DeNadai Dep. at 24–25.

VESTING SCHEDULE FOR DENADAI'S STOCK OPTIONS AS OF PETITION DATE

| | Ziff–Davis (ISO) | | ZDNet (ISO) | ZDNet |
|---|---|---|---|---|
| 24 Jun 1998 (Day 0) | | | | |
| | | 21 Dec 1998 (Day 0) | | |
| 31 Mar 1999 (Day 280) | 2,000 | | | |
| 30 Jun 1999 (Day 371) | 500 | | | |
| 30 Sep 1999 (Day 463) | 500 | | | |
| 31 Dec 1999 (Day 555) | 500 | 31 Dec 1999 (Day 375) | 18,415 | 47,210 |
| 31 Mar 2000 (Day 646) | 500 | 31 Mar 2000 (Day 466) | 16,406 | |
| 21 Jun 2000 (Day 728) | Petition Date | 21 Jun 2000 (Day 548) | Petition Date | |
| 30 Jun 2000 (Day 737) | 500 [4] | 30 Jun 2000 (Day 557) | 4,105 | 12,301 |
| 30 Sep 2000 (Day 829) | 500 | 30 Sep 2000 (Day 649) | | 16,406 |
| 17 Oct 2000 (Day 846) | Change of Control | 17 Oct 2000 (Day 666) | Change of Control | |
| 31 Dec 2000 (Day 921) | 500 | 31 Dec 2000 (Day 741) | | 16,407 |
| 31 Mar 2001 (Day 1011) | 500 | 31 Mar 2001 (Day 831) | 16,406 | |
| 30 Jun 2001 (Day 1102) | 500 | 30 Jun 2001 (Day 922) | 4,105 | 12,301 |
| 30 Sep 2001 (Day 1194) | 500 | 30 Sep 2001 (Day 1014) | | 16,406 |
| 31 Dec 2001 (Day 1286) | 500 | 31 Dec 2001 (Day 1106) | | 16,407 |
| 31 Mar 2002 (Day 1376) | 500 | 31 Mar 2002 (Day 1196) | 16,406 | |
| 30 Jun 2002 (Day 1467) | 500 | 30 Jun 2002 (Day 1287) | 4,105 | 12,301 |
| 30 Sep 2002 (Day 1559) | 500 | 30 Sep 2002 (Day 1379) | | 16,406 |
| 31 Dec 2002 (Day 1651) | 500 | 31 Dec 2002 (Day 1471) | | 16,407 |
| 31 Mar 2003 (Day 1741) | 500 | | | |
| Total | | Total | | |

4. The vesting schedule of the Ziff–Davis Grant was accelerated on June 30, 2000 so that 1,500 options, rather than 500, vested every subsequent three-month period. DeNadai Aff. ¶ 15. Furthermore, those options vesting after June 30, 2000 no longer qualified as ISOs. *Id.* The parties do not argue that these changes are material to this appeal, so the Court will not consider them further.

| Options | 10,000 | Options | 79,948 | 182,552 |
|---------|--------|---------|--------|---------|

*Id.* Ex. B at 2; *id.* Ex. C at 3; *id.* Ex. D at 3.

### 2. The Bankruptcy

In April 1999, DeNadai opened a margin account with Preferred for the purpose of trading stock and investment stock options. *Id.* ¶ 5. In 1999 and 2000, upon exercising vested Ziff–Davis and ZDNet stock options, DeNadai placed the acquired stock into his Preferred account. *Id.* By June 2000, DeNadai's account contained more than $1,000,000 in assets. *Id.*

After a single bad investment, DeNadai found himself owing Preferred about $1,982,115. *Id.* ¶¶ 6–7. Preferred subsequently seized all of the assets in DeNadai's account pursuant to its margin account agreement. *Id.* ¶ 8. Nevertheless, DeNadai still owed Preferred about $1,026,000. *Id.*

On or about June 19, 2000, Preferred filed suit against DeNadai. *Id.* ¶ 9. As a result, DeNadai filed Chapter 7 bankruptcy on June 21, 2000. *Id.*

## II. Analysis

### A. Relevant Legal Standards

#### 1. Standard of Review

■ Federal Rule of Bankruptcy Procedure 8013 sets forth a district court's standard of review when deciding an appeal from a bankruptcy court. The rule provides that the court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr.P. 8013. While "[f]indings of fact ... shall not be set aside unless clearly erroneous," *id.*, a district court must review conclusions of law de novo, *e.g., Ha-*

*seotes v. Cumberland Farms, Inc.,* 257 B.R. 691, 693 (D.Mass.2001) (Harrington, J.).

#### 2. Summary Judgment Standard

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56 applicable to summary judgment proceedings. Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The parties agree that there is no dispute as to a material fact and that the present appeal presents only legal issues subject to de novo review.

### B. Property of the Bankruptcy Estate

DeNadai appeals the decision of the Bankruptcy Court to include within the bankruptcy estate DeNadai's stock options to the extent they were earned pre-petition. DeNadai argues that those of his options that had not vested as of the Petition Date are not property of the bankruptcy estate under 11 U.S.C. § 541. In essence, DeNadai conceives of these then-unvested stock options as post-petition earnings that should not be included within the bankruptcy estate in order to allow him a "fresh start."

#### 1. The Bankruptcy Estate Under 11 U.S.C. § 541

■ Section 541 of Title 11 of the United States Code allows for the creation of

the bankruptcy estate when a bankruptcy case is commenced. 11 U.S.C. § 541(a). Section 541 sets forth a very broad definition of estate property, encompassing "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held." *Id.*

■ Subsections (a)(2) through (a)(7) add to this broad definition of the estate. Relevant to this case, section 541(a)(6) provides that the property of the estate includes "[p]roceeds, product, offspring, rents, or profits of or from property of the estate, *except* such as are earnings from services performed by an individual debtor after the commencement of the case," 11 U.S.C. § 541(a)(6) (emphasis added), and section 541(a)(7) provides that the property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case," *id.* § 541(a)(7). "While subsection (a)(7) includes property acquired by the *estate* after the commencement of the case, property of the estate generally does not include property acquired by the *debtor* after the commencement of the case." 3 William L. Norton, Jr., *Norton Bankruptcy Law and Practice* § 51:1, at 5 (2d ed. 1994 & Supp. 2001) [hereinafter *Norton*].

### 2. Stock Options as Property of the Estate

■ The property of the estate, however, cannot exceed the debtor's interest in the property prior to bankruptcy. *E.g., In re Coombs,* 86 B.R. 314, 317 (Bankr. D.Mass.1988). Accordingly, DeNadai would have this Court exclude from the bankruptcy estate those options that had not vested as of the Petition Date. DeNadai argues that, as of the Petition Date, he had no interest in his unvested stock options and that the Bankruptcy Court incorrectly looked beyond the Petition Date to determine whether he had any interest in the then unvested options. The case law, however, has consistently rejected DeNadai's present argument. Courts that have considered the question have concluded that debtors have a contingent contractual interest in options that are unvested as of the petition date, and that the contingent interest is property of the estate subject to the contingency.

The leading case concerning the treatment of stock options in bankruptcy is *Allen v. Levey (In re Allen),* 226 B.R. 857 (Bankr.N.D.Ill.1998). In *Allen,* the debtor had several sets of options, some of which were exercisable before the filing of the petition and some of which became exercisable after the filing of the petition. *Id.* at 859. The debtor in *Allen* argued that those options that became exercisable only after the petition date should not be included within the estate because the exercisability of those options was contingent upon his continued employment, making the options (once exercisable) post-petition earnings that should not be included within the estate pursuant to section 541(a)(6). *Id.* at 861.

*Allen* rejected the debtor's argument. *Allen* held that a stock option agreement—the contractual right to purchase shares of stock at a given price—is an interest in property that becomes property of the estate at the commencement of the case. *Id.* at 862–66. *Allen* conceived of the unexercisable options as a contractual property interest that is contingent upon future employment. *Id.* at 865. Thus, if the debtor were to meet the conditions precedent to the exercisability of the option, then, upon the exercising of his option, the company is under a binding obligation to sell him the stock at the option price. *Id.* In concluding that this contingent contractual interest is property of the estate, *Allen* analogized stock option agreements to other

contingent interests that are included within the estate. *Id.* at 863–64 (pointing to the contingent interests of a tax refund, a potential personal injury claim, a bad faith claim against an insurance company, a trust, continued payment of a non-competition agreement, entitlement to termination payments, and an attorney's contingent fee arrangement).[5]

*Allen's* conclusion that the debtor's contingent contractual interest in the stock option agreement was property of the estate makes it relevant whether the contingent event (continued employment until the options became exercisable) actually occurred, even if the contingency occurred *post*-petition. In so holding, the court rejected the debtor's argument that the options should be excluded from the estate as post-petition earnings under section 541(a)(6) because they were contingent upon the debtor's future employment:

Debtor has confused the right to possession of the stock with the rights granted to him under the [stock option agreements] .... The right at issue is the right to exercise the options contingent upon Allen's continued employment ...; Allen possessed this interest and right at commencement of his bankruptcy case.

. . . .

Although Debtor here did not become entitled to exercise all of the stock options until after filing his petition, he did possess at that time the contingent right to exercise the options in the future. This interest was sufficiently rooted in the pre-bankruptcy past to be property of the estate.

*Id.* at 865.[6] Thus, because the debtor had *in fact* remained employed and all of the

---

5. Courts consistently have concluded that contingent interests should be included within the bankruptcy estate. *E.g., Rau v. Ryerson (In re Ryerson),* 739 F.2d 1423 (9th Cir.1984) (holding that post-petition termination payments were property of the estate); *Booth v. Vaughan (In re Booth),* 260 B.R. 281, 285–87 (6th Cir. BAP 2001) (collecting cases holding that various contingent interests are property of the estate); *see also* H.R.Rep. No. 95–595, at 175–76 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6136 ("The bill determines what is property of the estate by a simple reference to what interests in property the debtor has at the commencement of the case. This includes all interests, such as interests in real or personal property, tangible and intangible property, choses in action, causes of action, rights such as copyrights, trade-marks, patents, and processes, contingent interests and future interests, whether or not transferable by the debtor." (footnotes omitted)).

6. Although involving stock, rather than stock options, the court in *In re Taronji,* 174 B.R. 964 (Bankr.N.D.Ill.1994), reached a similar conclusion. In *Taronji,* the debtor received an award of 525 shares of restricted stock such that the stock could not be transferred at all until the debtor had been employed for

four years. *Id.* at 966. The debtor filed his petition only three years after the stock was issued, and he argued that the stock should not be property of the estate because it remained restricted unless he continued to work for another year. *Id.* Like *Allen,* the court characterized the interest in the stock as a contract right to receive unrestricted shares, contingent on continued employment. The court concluded that the estate was entitled to a pro rata share of the stock (three years), if in fact the contingency came to pass. In so holding, *Taronji* rejected the argument that because the contract was contingent on future employment, *all* of the stock should be excluded from the estate:

The debtors argue that the entire value of the stock depended on Taronji's postpetition services, since, unless he was employed postpetition, the stock would not have been awarded. However, while Taronji's postpetition employment was *necessary* to the award of Tenneco stock, it was hardly *sufficient.* Taronji was entitled to this stock under the Tenneco Plan because he had been *continuously* employed for four years. His prepetition services were also essential. *Id.* at 971–72 (emphasis added); *see also Banner v. Bagen (In re Bagen),* 186 B.R. 824, 828–

options became exercisable, the court held that the options were property of the estate:

> Upon his commencement of this bankruptcy case, some of those rights had vested in Debtor subject to divestment if he later left [his place of] employ without exercising the rights, and some of his rights were then contingent on his continued employment. A contingency is no bar to a property interest becoming property of the bankruptcy estate, even if the contingency requires additional post-petition services, and even if the right to enjoyment of the property may be defeated. The Debtor's contract rights under the [option agreements], whether then vested or contingent, became property of the estate under § 541(a)(1) on the petition filing date
> . . . .

*Id.* at 865–66.

### a. Vested vs. Exercisable

DeNadai attempts to attack the holding in *Allen* by arguing that it did not adequately address the distinction between vesting and exercisability. DeNadai maintains that, unlike "exercisability," which he understands to be a contractual concept that can be subject to a contingency, "vesting" is a title concept. DeNadai argues that until vested, he did not have *title* to his stock options, from which he concludes that he had no interest in the options. Appellant's Reply at 1–2.

DeNadai's attempt to distinguish between "vesting" and "exercisability" draws too fine a line, one that is not supported by the case law. Although DeNadai may be correct that he does not possess *title* to the

option until the options vest, this ignores that DeNadai still has a contractual right subject to a contingency in even the unvested options. *Allen* rejected DeNadai's very argument, explaining that the debtor was confusing the right to possession[7] with the contingent contractual right in the yet unexercisable options. 226 B.R. at 865. *Allen's* reasoning is equally applicable to the concept of vesting. Indeed, DeNadai actually admits this in his brief when he recognizes that "the case analysis in *Allen* appears to indicate that the court would have considered the unvested rights to be property of the estate." Appellant's Br. at 23.

Moreover, *In re Lawton*, 261 B.R. 774 (Bankr.M.D.Fla.2001), the most recent case to address the issue, explicitly included unvested options within the property of the estate, subject to the contingency of the debtor's future employment. In *Lawton*, the debtor entered into a stock option agreement on December 4, 1997 and filed bankruptcy on October 1, 1999. *Id.* at 776. Not all of the debtor's options had vested as of the commencement of the case; the remaining options were scheduled to vest as follows:

| | |
|---|---|
| December 31, 1999 | 993 options |
| December 31, 2000 | 1,322 options |
| December 31, 2001 | 1,652 options |
| December 31, 2002 | 1,983 options |

*Id.* The court, relying on *Allen*, held that, subject to the debtor's continued employment, the estate was entitled to a percentage of the options listed above once the options *vested. Id.* at 780. In so holding,

---

30 (Bankr.S.D.N.Y.1995) (rejecting argument that the fact that continued employment was the contingency on which a contract turned somehow excluded the contract from the estate), *aff'd*, 201 B.R. 642 (S.D.N.Y.1996).

7. *Allen* described the property interest in stock options as a form of equity, stating that stock options, as rights to purchase securities, are "equity securities" as defined by 11 U.S.C. § 101(16). 226 B.R. at 865.

*Lawton* emphasized that the options only became property of the estate after they *actually* vested; until that point, they were *contingent* on an unknown future event (the debtor's continued employment). *Id.* ("The trustee is only entitled to receive his prorated percentage of the options *after* they vest."); *see also Booth v. Vaughan (In re Booth)*, 260 B.R. 281, 289 (6th Cir. BAP 2001) (rejecting argument that only vested interests are property of the estate).

The case law does not support DeNadai's attempt to distinguish between "vesting" and "exercisability." Whether unvested options are conceived of as contract rights or equity interests, they represent interests subject to a contingency that are properly understood as property of the estate.[8]

### b. Overlapping vs. Consecutive Vesting Periods

DeNadai further attempts to distinguish the holding in *Allen* by arguing that those stock options that had not vested as of the Petition Date are post-petition earnings that should be excluded from the bankruptcy estate pursuant to section 541(a)(6). In so arguing, DeNadai would have this Court conceive of each three-month vesting period as compensating him for the services he performed during that respective three-month period. As the Trustee and Preferred point out, however, the stock option agreements themselves do not support this conclusion.[9]

First, the stock option agreements set forth overlapping, not consecutive, vesting periods. Thus, the terms of the agreements provide that, although DeNadai's continued employment was necessary for his options to vest over time, his employment during what he interprets as a discrete vesting period is alone insufficient for the options to vest. In order for his options to vest, DeNadai was required to work *continuously* from the day he signed the option agreement to the day the options were scheduled to vest. *See In re Taronji*, 174 B.R. 964, 971–72 (Bankr. N.D.Ill.1994); discussion *supra* note 6.

Second, the case law does not support characterizing the stock option agreements as providing compensation for discrete periods of time. The court in *Lawton* also was faced with the question whether the stock options before it were "wages" that would be exempt from bankruptcy under Florida law. The court framed the question as whether the stock option agreement before it should be treated merely as providing an asset to the employee or as setting forth a compensation plan. The

---

**8.** This Court recognizes that state law determines the existence and nature of any property interests of a debtor, and that federal law determines whether those rights are sufficient to constitute property of the estate. 3 *Norton, supra,* § 51:3, at 10. None of the parties have adequately addressed which state law applies: Massachusetts law (where the case is pending), Delaware law (where Ziff–Davis was incorporated), or New York law (where the choice of law provision in each of the option agreements points). DeNadai has not argued that prior to bankruptcy he had no property interest whatsoever in his unvested options, however, so this Court need not determine the precise property interest that DeNadai had under state law before the unvested options became part of the bankruptcy estate under federal law.

**9.** The Court need not examine extrinsic evidence to interpret contract provisions when the contractual language is unambiguous. This is true under Massachusetts, New York, and Delaware law. *E.g., Boston Car Co. v. Acura Auto. Div., Am. Honda Motor Co.*, 971 F.2d 811, 815 (1st Cir.1992) (applying Massachusetts law); *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 565 N.Y.S.2d 440, 566 N.E.2d 639, 642 (1990); *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del.1992).

court stated that the key distinction between stock option agreements that serve as assets and stock option agreements that represent wages is whether the stock options track the performance of the employee or serve simply as a perk to increase the attractiveness of employment: stock options given to general employees and not tied to their individual performances are assets; stock options given to executives in lieu of or in addition to a salary and determined by individual performance are wages. 261 B.R. at 778. *Lawton* concluded that the stock options before it were assets and not wages because they arose from a general grant to full-time employees, they were not pegged to the debtor's individual performance, the debtor was not a director, and the plan indicated that the stock options were meant to serve as an incentive. *Id.*

In so concluding, *Lawton* contrasted the stock option agreement before it with the one considered in *Larson v. Cameron (In re Larson)*, 147 B.R. 39 (Bankr.D.N.D. 1992). In *Larson*, the court concluded that the stock options before it were intended to serve as compensation and were not granted as an asset because the debtor was a director, the value of the options was directly tied to his performance, and the stock option agreement was documented as compensation. *Id.* at 42.

DeNadai's stock option agreements are more analogous to the agreement in *Lawton* than that in *Larson*. Here, the stock option agreement was offered to general employees, specifically to any "employees and consultants of the Company ... who have demonstrated significant management potential or who have the capacity for contributing in a substantial measure to the successful performance of the Company." DeNadai Aff. Ex. A ¶ 3. The option agreements were not designed to track DeNadai's specific performance. This is reinforced by the inclusion of the change of control clause. Nor were the options given in lieu of compensation. DeNadai was paid a salary, Appellees' App. Ex. 2C (Schedule I), and the stated purpose of the Plan is not to compensate the employee; rather its purpose is to "promote the growth and performance of Ziff-Davis ... by encouraging its employees ... to acquire an ownership position in the Company through the holding of common stock" so that the company could "attract and retain employees ... of outstanding ability," DeNadai Aff. Ex. A ¶ 1. All of these factors support the conclusion that DeNadai's stock option agreements were meant to provide him with a reward and not to serve as compensation.

This Court's interpretation of the agreements as providing DeNadai with an asset does not support his conception of the options as containing discrete vesting periods.[10] Therefore, this Court concludes

---

10. DeNadai argues for the first time in his reply brief that Massachusetts law supports his interpretation of the option agreements. DeNadai relies on *Harrison v. NetCentric Corp.*, 433 Mass. 465, 744 N.E.2d 622 (2001), and *Sargent v. Tenaska, Inc.*, 108 F.3d 5 (1st Cir.1997). Both cases, applying Massachusetts law, considered to what extent the doctrine established in *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977) (holding that an employer is accountable to a discharged employee for unpaid compensation if the employee is terminated in bad faith and the compensation is clearly connected to work already performed), applies to unvested options. Both courts concluded that the unvested options were not compensation earned for past services, but rather compensation contingent on continued employment. As *Harrison* explained, "[t]he defendants did not deprive the plaintiff of any income that he reasonably earned or to which he was entitled. His shares vested over time only if he continued to be employed; thus, the unvested shares are not earned compensation for past services, but compensation contingent on his continued employment." 433 Mass. at 473,

that DeNadai's then-unvested options need not be excluded from the estate pursuant to section 541(a)(6) as representing *entirely* post-petition earnings.

### 3. Allocating Stock Options Between the Bankruptcy Estate and the Debtor

 Even though this Court concludes that DeNadai's option agreements were designed to reward him for his services rather than to serve as compensation, the fact remains that, absent DeNadai's continued employment, DeNadai's contingent interest in his stock options would never have vested. Thus, the Court is left with the difficult task of apportioning his now vested options between him and the bankruptcy estate. Here, the Court turns back to the leading case of *Allen.*

744 N.E.2d 622. DeNadai also points out that in *Harrison,* the court was not moved by the fact that the option agreement contained an accelerated vesting clause in the case of a change of control, holding that this clause was not proof that the unvested shares represented compensation for past services. *Id.* at 475, 744 N.E.2d 622.

Reliance on this line of cases does not assist DeNadai for three reasons. First, DeNadai has waived the argument because he raised it too late. *Fish Mkt. Nominee Corp. v. Pelofsky,* 72 F.3d 4, 6 (1st Cir.1995) (holding that arguments not raised before the bankruptcy court are considered waived on appeal); *VanHaaren v. State Farm Mut. Auto. Ins. Co.,* 989 F.2d 1, 7 n. 7 (1st Cir.1993) (noting that issues raised for the first time in an appellate reply brief are deemed waived). Second, DeNadai gives no explanation of why Massachusetts law should apply when interpreting the terms of the agreement. Indeed, DeNadai concedes that all of the stock option agreements contain a choice of law provision indicating that the agreements "shall be construed and interpreted in accordance with the laws of the State of New York." DeNadai Aff. Ex. B ¶ 17; *accord id.* Ex. C ¶ 17; *id.* Ex. D ¶ 15. Because this issue addresses the interpretation of the agreements, New York law should ap-

*Allen* did not hold that *all* of the options were property of the estate. The court concluded that the realized value of the stock options that remained contingent at the time of filing the petition was property of the estate *only to the extent* the subsequently realized value was related to *pre-petition* actions of the debtor. The court accordingly divided the options on a pro rata basis:

Whatever percentage of the time required for exercise of each group of options had passed before Allen filed his petition in bankruptcy, that percentage of option value is allocated to the bankruptcy estate. Whatever percentage of the time required for exercise of the options passed after the date of Allen's petition in bankruptcy, that percentage of the option value belongs to Allen.

*Id.* at 867.[11] In so holding, the court reconciled section 541(a)(6), which excludes

ply. Third, the holdings of *Harrison* and *Sargent* do not assist DeNadai. Although on their face these cases appear to support De-Nadai's understanding of the option agreements, the analogy is imperfect. In both *Harrison* and *Sargent,* the employees were fired, meaning that, under the applicable option agreements, the options would never vest because they were contingent on the employees' *continued* employment. Thus, these cases only stand for the proposition that continued employment is *necessary* to earn the benefit of the options and not that it is *sufficient.* De-Nadai must show *both* to persuade this Court that the vesting periods were distinct and meant to compensate for only future employment. Put differently, the cases do not stand for the proposition that *once vested,* the options should not be apportioned on a pro rata basis which takes into account pre— and post-petition contributions to the vesting of the options.

11. Expressed as a mathematical formula, *Allen* held that the estate is entitled only to a fraction of the unvested options, where the numerator of the fraction represents the number of days from the beginning of the vesting period (when the agreement was entered) to the day on which the petition was filed, and

post-petition earnings from the estate, and section 541(a)(7), which includes proceeds from any contingent interest in the estate. *Id.* DeNadai appeals the Bankruptcy Court's application of the *Allen* formula in apportioning his options for several reasons.

First, DeNadai argues that the Bankruptcy Court should not have taken into account the October 17, 2000 change in control in determining the pre-petition portion of the options. Put differently, DeNadai urges this court to determine the estate's entitlement to the stock options as of the Petition Date. Relying on *Allen,* this Court rejects DeNadai's approach. Because stock option agreements are contracts that are subject to a contingency, the vesting of DeNadai's options was contingent on either DeNadai remaining employed with Ziff–Davis or there being a change in control. To ignore these post-petition contingencies is contrary to section 541(a)(7) of the Bankruptcy Code, which provides that the property of the estate includes "[a]ny interest in property that the estate acquires *after* the commencement of the case." 11 U.S.C. § 541(a)(7) (emphasis added). As Preferred and the Trustee argue, although the estate is *created* when DeNadai filed his petition, DeNadai has no basis for arguing that this Court should simply ignore post-petition events for purposes of determining the estate's contingent interest.

Second, DeNadai argues that the *Allen* calculation improperly gives the estate too large of a percentage of the options. DeNadai argues that because he "had worked for Ziff–Davis for 42% of the term of the Ziff–Davis Grant and 37% of the term of the ZDNet Grant," the estate should only be entitled to that amount. Appellant's Br. at 26. This argument is, in essence, a restatement of DeNadai's previous argument. DeNadai's suggestion that this Court should use the contractual terms of the vesting periods in apportioning the options ignores the fact that the vesting periods under both agreements were dramatically cut short by the change of control on October 17, 2000. As indicated above, it would be improper to ignore the happenings of future events on which contingent interests turn.

To support his proposed allocation of the options, DeNadai points to two cases: *Stoebner v. Wick* (*In re Wick*), 249 B.R. 900 (Bankr.D.Minn.2000), *rev'd on other grounds,* 256 B.R. 618 (D.Minn.2001), and *Larson v. Cameron* (*In re Larson*), 147 B.R. 39 (Bankr.D.N.D.1992). The Court concludes, however, that these cases are not inconsistent with the holding in *Allen* and hence do not refute the Bankruptcy Court's allocation of the options.

In *Wick,* the debtor's option agreement provided that the options would vest after a year of employment, but the debtor filed a bankruptcy petition after having worked only one-third of a year. 249 B.R. at 904–05. The debtor did in fact work for a year, and ultimately her options did vest. *Id.* at 905. Relying on *Allen,* the court held that the debtor's interest in the stock option was a contract right contingent on a future event (here, continued employment), and accordingly, the options were property of the estate. *Id.* at 908–09. Again relying on *Allen,* the court also held that the options were property of the estate *to the extent* they were based on *pre-petition* performance: "[W]here stock options vest as a result of both prepetition and postpetition services, the estate's interest is the pro rata portion of the option that is related to the debtor's prepetition services." *Id.* at 909. Thus, the court apportioned

the denominator represents the total number of days in the vesting period.

one-third of the options to the estate. *Id.* at 910.

In *Larson,* the debtor received options in lieu of compensation for the fiscal year ending June 30, 1991. 147 B.R. at 40. The options were issued on July 16, 1990 and were exercisable upon issue. *Id.* at 40–41. When the debtor filed his petition on October 16, 1990, he had not exercised his options. *Id.* The court held that although some of the options should be considered earnings, not all of them were earned *post*-petition; only those options earned after the petition date should be excluded from the estate. *Id.* at 44. The court accordingly divided the options on a pro rata basis: because the debtor had worked for 117 days before filing his petition, 117/365 of the options were apportioned to the estate. *Id.*

DeNadai's suggestion that *Wick* and *Larson* set forth a different rule of apportionment than *Allen* (or *Lawton*) is incorrect. All of these cases applied the same pro rata rule—apportioning those options that were based on pre-petition employment to the estate and apportioning those options that were based on post-petition employment to the debtor. It is merely coincidence that *Wick* and *Larson* involved single vesting periods so that, as applied, the pro rata rule resulted in the creation of a single percentage rather than various percentages that take into account each individual, overlapping vesting period. Indeed, *Wick* explicitly applied the rule set forth in *Allen.* The case law has consistently applied the *Allen* formulation, and this Court sees no reason to stray from it.

Finally, DeNadai urges this Court to reject *Allen's* rule of apportionment because it does not allow DeNadai to have a "fresh start." Appellant's Br. at 29–31 (relying on *Kokoszka v. Belford,* 417 U.S. 642, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974) (holding that an income tax refund was property of the estate because it was not necessary for a fresh start), and *Lines v. Frederick,* 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970) (holding that vacation pay that was accrued prior to the filing of bankruptcy but not collectible until termination, was not property of the estate because it was necessary for a fresh start)).[12] This Court's holding, however, properly attributes post-petition earnings to DeNadai by apportioning to him those stock options that he could be understood as earning post-petition. This Court's application of *Allen* and *Lawton,* therefore, gives adequate consideration to the fresh start policy principle expressed in these cases.

The case law consistently characterizes stock option agreements as contingent contract rights and accordingly includes them within the bankruptcy estate. Still, recognizing that the contingency upon which the exercisability of the options depends is continued employment of the debtor, courts have also consistently distributed the options on a pro rata basis so that only that percentage of the options that were earned pre-petition are brought within the bankruptcy estate. The Court is persuaded by the reasoning of these decisions. Accordingly, this Court holds that the Bankruptcy Court was correct in holding that the options are property of the estate to the extent they were earned pre-petition. The Appendix sets forth the proper calculation of this apportionment, which is identical to that of the Bankruptcy Court.

**12.** While the Trustee and Preferred are correct that the enactment of the Bankruptcy Code overruled *Lines,* the fresh start policy espoused in *Lines* still inheres in the Code. .H.R.Rep. No. 95–595, at 175–76 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6136; 3 *Norton, supra,* § 51:2, at 7–8.

## C. Exemption from the Bankruptcy Estate

■ Under the Bankruptcy Code, property may be exempted from the estate pursuant to 11 U.S.C. § 522. Section 522(b) provides that debtors have the option of choosing between those exemptions set forth by federal bankruptcy law, found in section 522(d), or alternatively, those exemptions made available under other federal, state, or local law, 11 U.S.C. § 522(b)(2)(A). DeNadai chose to avail himself of those exemptions made available under other federal, state, or local law.

Specifically, DeNadai advances two arguments supporting exemptions under section 522(b)(2)(A): (1) under Massachusetts law the stock options are exempt from creditor process, and (2) ISOs, like ERISA benefits, have non-transferability requirements that exempt them under nonbankruptcy federal law. The Court addresses each argument in turn.

### 1. Massachusetts Law [13]

■ Property is exempt from the bankruptcy estate under section 522(b)(2)(A) if state law protects the property against all forms of judicial process. *In re Geise*, 992 F.2d 651, 658 (7th Cir. 1993); 4 *Collier on Bankruptcy* § 522.10[4], at 73 (Lawrence P. King ed., 15th ed. rev. 1996 & Supp.2001). Accordingly, DeNadai argues that his stock options should be exempt because Massachusetts law protects them from judicial process. He reasons as follows: (1) under Massachusetts law, "[s]hares of stock shall not be attached in a civil action in which only money damages are sought," Mass. Gen. Laws ch. 223, § 71; (2) although, generally speaking, stock is subject to the equitable remedy of reach and apply, Mass. Gen. Laws ch. 214, § 3(7); [14] *id.* ch. 223, § 86A; 14A Howard J. Alperin & Lawrence D. Shubow, *Massachusetts Practice: Summary of Basic Law* § 8.57 (3d ed.1996); 48 Jordan L. Shapiro, Marc G. Perlin & John M. Connors, *Massachusetts Practice: Collection Law* § 11:30 (3d ed.2000) [hereinafter *Collection Law*]; *see also Anderson Foreign Motors, Inc. v. New England Toyota Distrib., Inc.*, 475 F.Supp. 973, 977–78 (D.Mass.1979), only assignable interests are subject to reach and apply, *Hurley v. Boston R. Holding Co.*, 315 Mass. 591, 619, 54 N.E.2d 183 (1944) (dicta); *Collection Law, supra*, §§ 11:9, 11:31; (3) DeNadai's stock options are non-assignable and such transfer restrictions on stock have been upheld in Massachusetts courts, *Colbert v. Hennessey*, 351 Mass. 131, 138–39, 217 N.E.2d 914 (1966); *Brown v. Little, Brown & Co.*, 269 Mass. 102, 110, 168 N.E. 521 (1929); and (4) thus, his non-assignable stock options are exempt from judicial process and hence exempt under section 522(b)(2)(A). Appellant's Br. at 33–35.

This Court is not persuaded by DeNadai's attempt to weave an exemption out of this string of statutes and case law. Even assuming that Massachusetts General Laws ch. 223, § 71 applies to stock options as well as stock, it is an insufficient foundation for DeNadai's attempted exemption. Massachusetts General Laws ch. 223, § 71 differs in form from those Massachusetts

---

13. In considering exemptions under state law, the Court looks to Massachusetts law because DeNadai's domicile is in Massachusetts. 11 U.S.C. § 522(b)(2)(A).

14. An action to reach and apply is "a method in equity to secure and hold for satisfaction of a judgment all forms of property that by law may not be attached or taken on execution. In this sense, the reach and apply action picks up where the legal methods of attachment ... and execution leave off." 48 Jordan L. Shapiro, Marc G. Perlin & John M. Connors, *Massachusetts Practice: Collection Law* § 11:2 (3d ed.2000).

statutes that set forth exemptions. Those Massachusetts statutes that set forth exemptions do so clearly and unequivocally.[15] In contrast, Massachusetts General Laws ch. 223, § 71 prohibits only the attachment (and not the reaching and applying) of stock, and only prohibits it "in a civil action in which only money damages are sought." Mass. Gen. Laws ch. 223, § 71. Thus, it does not prohibit the attachment of stock in other types of suits; nor does it explicitly speak to insolvency suits. Because of this difference in kind, the Court hesitates to read Massachusetts General Laws ch. 223, § 71 as setting forth the foundation upon which DeNadai attempts to build his exemption under Massachusetts law.

Nor is the Court persuaded that the combination of (1) *Hurley's* dicta that a suit for reach and apply "can be brought only to reach and apply property that is assignable," *Hurley*, 315 Mass. at 619, 54 N.E.2d 183, and (2) Massachusetts General Laws ch. 223, § 71, is sufficient evidence of the existence of a general Massachusetts exemption for non-assignable interests in stock. In *Hurley*, the Supreme Judicial Court held that the particular stock at issue (Boston and Maine Railroad stock) was not assignable because, *by statute*, it could not be sold without express legislative authority. 315 Mass. at 619, 54 N.E.2d 183.

*Hurley* relied on *Bethlehem Fabricators, Inc. v. H.D. Watts Co.*, 286 Mass. 556, 190 N.E. 828 (1934). *Bethlehem* considered whether a particular cause of action that sounded in tort could be reached and applied to satisfy a judgment. *Id.* at 564–68, 190 N.E. 828. Recognizing that "[a] cause of action which is not assignable cannot be reached and applied," *id.* at 565, 190 N.E. 828, the court concluded that even though the cause of action sounded in tort, it was assignable—and hence could be reached and applied—because it sought recovery for damages to specific property. *Id.* at 567, 190 N.E. 828.

*Bethlehem* relied, in turn, on *Pettibone v. Toledo, Cincinnati & St. Louis Railroad Co.*, 148 Mass. 411, 19 N.E. 337 (1889), and *Bennett v. Sweet*, 171 Mass. 600, 51 N.E. 183 (1898). *Pettibone* held that a claim for breach of contract that could not be assigned could not be reached and applied under the then-existing reach and apply statute. 148 Mass. at 419–20, 19 N.E. 337. The court reasoned that "the [contracting party] cannot be compelled to receive the [creditors] in place of the [debtor] as the party to whom they are bound." *Id.* at 420, 19 N.E. 337. Similarly, *Bennett* held that because a personal injury action was not assignable, it could not be reached and applied until a court entered judgment for a definite sum of money. 171 Mass. at 601, 51 N.E. 183.

Although DeNadai would have this Court read *Hurley* as stating a general rule that *no* non-assignable interest can be reached and applied, it should not be so interpreted. Indeed, the First Circuit in

---

15. *E.g.*, Mass. Gen. Laws ch. 175, § 110A (disability insurance benefits: "shall not be liable to attachment, trustee process or other process, or to be seized, taken, appropriated or applied by any legal or equitable process or by operation of law"); *id.* ch. 188, § 1 (homestead: "exempt from the laws of conveyance, descent, devise, attachment, levy on execution and sale for payment of debts"); *id.* ch. 235, § 34 (personal property: "shall be exempt from seizure on execution"); *id.* ch. 235, § 34A (annuity: "shall be exempt from the operation of any law relating to insolvency and shall not be attached or taken on execution or other process to satisfy any debt or liability of such person"); *id.* ch. 246, § 28 (wages and pensions: "shall be exempt from attachment"); *id.* ch. 246, § 28A (money held by banks: "shall be exempt from attachment by trustee process"); *see also* 2 *Norton, supra*, App. 46, at 131–34 (collecting exemptions under Massachusetts law).

*Tilcon Capaldi, Inc. v. Feldman,* 249 F.3d 54 (1st Cir.2001), recently refused to extend *Hurley's* reasoning to non-assignable interests in trusts. There, the court considered whether the defendant's three trusts could be reached and applied despite the existence of joint venture agreements that made those trust interests unassignable. *Id.* at 58–59. The First Circuit rejected the argument that *Hurley* set forth a general rule that non-assignable interests cannot be reached and applied:

> [B]ased on his reading of Massachusetts case law, the district judge held—as a general rule—that the reach and apply statute in Massachusetts applies only to interests that *are* capable of being assigned. . . .
>
> We disagree. The reach and apply statute in Massachusetts is very broadly written and contains no express reservation for cases in which an anti-assignment clause exists. Indeed, the statute extends explicitly to a defendant's interest in partnership property where one would expect that there would commonly be contractual limits on assignment. Mass. Gen. Laws ch. 214, § 3(6). It is hard to see why the Massachusetts Supreme Judicial Court, which decided *Ware* [v. *Gulda,* 331 Mass. 68, 117 N.E.2d 137 (1954) ],[16] would not read the statute to override self-imposed anti-assignment clauses as readily as self-imposed clauses barring creditor attachment. Indeed, *Ware* itself involved a trust in which both clauses were present.

The district court's contrary view rests primarily on one Massachusetts decision [*Bethlehem* ] stating that certain personal tort causes of action were unassignable and could not be reached under the reach and apply statute. But such claims are unassignable for policy reasons that do not apply here. We do not read *Bethlehem* or [*Hurley* ] where state law barred a transfer of an interest without legislative consent as making a self-imposed anti-assignment clause a bar to the reach and apply statute.

*Id.* at 60–61 (citations omitted).

Similarly, the policy reasons upon which *Hurley, Bethlehem, Pettibone,* and *Bennett* relied are inapplicable to this case. Here, the anti-assignment clauses of the stock options stem from neither common law nor statute. Rather, they are contractual and serve business and tax purposes, not public policy. Moreover, the bankruptcy code recognizes that only in limited circumstances (of which this is not one) are non-transferability restrictions to be respected in bankruptcy. 11 U.S.C. § 541(c); 3 *Norton, supra,* § 51:15, at 49–51. Thus, because the underlying reasoning of *Hurley* and its predecessors is inapplicable to De-Nadai's stock options in bankruptcy, it would be inappropriate to extend *Hurley* in this context.

■ Finally, even if DeNadai were correct that this string of cases and statutes results in the inability under state law to reach his stock options, DeNadai has failed to convince the Court that he has found an exemption under Massachusetts law rather

---

**16.** In *Ware,* the Supreme Judicial Court held that, despite the general rule that creditors cannot reach and apply spendthrift trusts, different rules apply when a settlor creates a trust for his own benefit and then attempts to immunize that trust from creditor process: "Where a person creates for his own benefit a trust for support or a discretionary trust, his transferee or creditors can reach the maximum amount which the trustee under the terms of the trust could pay to him or apply for his benefit." 331 Mass. at 70, 117 N.E.2d 137 (internal quotation marks omitted); *accord Restatement (Second) of Trusts* § 156(2) (1959).

than a mere gap in judicial process. The Court hesitates to transform this possible gap in process into an exemption without some evidence that either the Massachusetts legislature or courts intended this result. *Cf. Howe v. Richardson*, 193 F.3d 60, 62 (1st Cir.1999) ("[T]he failure of common law remedies to reach such claims should be regarded merely as a gap in the law ... and not as an 'exemption' reflecting a policy or purpose to safeguard such interests from seizure by creditors in general or bankruptcy creditors in particular."), *cert. denied*, 529 U.S. 1021, 120 S.Ct. 1424, 146 L.Ed.2d 315 (2000).

For the foregoing reasons, the Bankruptcy Court was correct in holding that DeNadai's stock options are not exempt from the bankruptcy estate under Massachusetts law.

## 2. Federal Law

■ DeNadai argues that his ISOs should be exempt from the bankruptcy estate under federal law. He reasons as follows: (1) ERISA pension benefits are exempt from the bankruptcy estate under section 522(b)(2)(A) because they contain a statutory non-transferability requirement, ERISA § 206(d)(1), 29 U.S.C. § 1056(d)(1); (2) ISOs are subject to a similar non-transferability requirement, I.R.C. § 422(b)(5); and (3) therefore, like ERISA pension benefits, ISOs should be considered exempt under section 522(b)(2)(A). Appellant's Br. at 35–38. Although the first two steps of DeNadai's reasoning are valid, his third step is flawed.

Courts have disagreed as to whether ERISA pension benefits are in fact exempt under section 522(b)(2)(A) in light of ERISA § 206(d)(1),[17] which provides that ERISA pension benefits cannot be assigned or alienated.[18] *Compare In re Komet*, 104 B.R. 799 (Bankr.W.D.Tex.1989), *with In re Goff*, 706 F.2d 574 (5th Cir. 1983) (dicta). The bankruptcy courts in the District of Massachusetts, however, relying in large part on the reasoning of *Komet*, have consistently held that ERISA benefits *are* exempt under section 522(b)(2)(A) based on the non-alienation provision contained in ERISA § 206(d)(1). *In re Hennessey*, 135 B.R. 711, 716–17 (Bankr.D.Mass.1992); *In re White*, 131 B.R. 526 (Bankr.D.Mass.1991).

It is also true that I.R.C. § 422, which sets forth the requirements that stock option plans must meet in order for them to

**17.** ERISA § 206(d)(1) provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1).

**18.** Whether ERISA benefits are exempt under section 522(b)(2)(A) appears largely moot, however, in light of the Supreme Court's decision in *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), which held that ERISA § 206(d)(1) "constitutes an enforceable transfer restriction for purposes of § 541(c)(2)'s exclusion of property from the bankruptcy estate," *id.* at 760, 112 S.Ct. 2242. Section 541(c)(2) provides that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title"—effec-

tively excluding from property of the estate such interests. 11 U.S.C. § 541(c)(2). The Bankruptcy Court already determined that ISOs do not qualify as a "trust" for purposes of section 541(c)(2), 259 B.R. at 807–08, and DeNadai did not appeal this ruling.

Because the present appeal does not concern exemptions under section 541(c)(2), *Pineo v. Fulton (In re Fulton)*, 240 B.R. 854 (Bankr.W.D.Pa.1999), relied on by Preferred and the Trustee, is inapposite. Appellees' Br. at 38–39. *Fulton* merely held that the transfer restrictions on individual retirement annuities did not alone establish that they were "trusts" for purposes of section 541(c)(2). 240 B.R. at 861–62. Thus, *Fulton* does not address the question of exemption under section 522(b)(2).

achieve tax-qualified treatment, requires that the incentive stock option be "not transferable by such individual otherwise than by will or the laws of descent and distribution, and ... exercisable, during his lifetime, only by him." I.R.C. § 422(b)(5). Thus, I.R.C. § 422(b)(5) is a non-transferability clause that, on its face, is similar to ERISA § 206(d)(1).

DeNadai would have this Court conclude from these two facts alone that ISOs, like ERISA pension benefits, should be exempt from the bankruptcy estate under section 522(b)(2)(A). Although DeNadai sees the two non-transferability provisions as analogous, the analogy is too weak to support an exemption for ISOs under section 522(b)(2)(A).

Unlike ERISA § 206(d)(1), from which courts have inferred a congressional intent to exempt ERISA pension benefits from creditor process, there is no evidence that Congress intended I.R.C. § 422(b)(5) to create a similar exemption. This difference is significant because, in concluding that ERISA pension benefits are exempt under section 522(b)(2)(A), courts have relied on the fact that Congress intended ERISA § 206(d)(1) to serve not merely as a requirement for special tax benefits, but also as a general exemption from creditor process. Courts have combined ERISA § 514(a), 29 U.S.C. § 1144(a), the preemption provision of ERISA, with ERISA § 206(d)(1) to conclude that ERISA § 206(d)(1) protects pension plan benefits from state law collection statutes. *In re Komet*, 104 B.R. at 806 (collecting cases); *see also Patterson v. Shumate*, 504 U.S. 753, 760, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *Guidry v. Sheet Metal Workers*

*Nat'l Pension Fund*, 493 U.S. 365, 371–72, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990) ("The view that the statutory restrictions on assignment or alienation of pension benefits apply to garnishment is consistent with applicable administrative regulations,[19] with the relevant legislative history, and with the views of other federal courts. It is also consonant with other statutory provisions designed to safeguard retirement income." (footnotes omitted)); *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837–38, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). Moreover, those courts that have allowed an exemption for ERISA pension benefits under section 522(b)(2)(A) have explicitly rejected that ERISA § 206(d)(1) serves only to provide a tax benefit. *Compare In re Komet*, 104 B.R. at 809 (noting that although ERISA § 206(d)(1) is a condition for tax qualification, it is also required of *any* plan under ERISA), *with In re Goff*, 706 F.2d at 585 (dicta) (rejecting that ERISA pension benefits are exempt because, inter alia, "ERISA merely provides that *as a condition of obtaining qualified status*—with its attendant tax and other benefits—a pension plan must preclude alienation or assignment of its benefits").

In contrast, DeNadai fails to point to any evidence that Congress intended I.R.C. § 422(b)(5) to serve as a general exemption from creditor process. Indeed, the congressional history indicates otherwise. Congress intended the requirement that ISOs be non-transferable set forth in I.R.C. § 422(b)(5) to provide a tax benefit to the recipient of stock options:

The Committee believes that reinstitution of a stock option provision will pro-

---

19. Treasury Department regulations state that for tax purposes "a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned (either at

law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process." 26 C.F.R. § 1.401(a)–13(b)(1) (1989).

vide an important incentive device for corporations to attract new management and retain the service of executives who might otherwise leave, by providing an opportunity to acquire an interest in the business.

S.Rep. No. 97–144, at 98 (1981), *reprinted in* 1981 U.S.C.C.A.N. 105, 201. Nor does DeNadai have any evidence that the ISO non-transferability provision was designed to exempt ISOs from state collection actions. Indeed, unlike ERISA, which explicitly preempts state law, I.R.C. § 422 standing alone does not create the inference that its non-transferability provision would preempt state law in order to protect ISOs from state collection actions.

DeNadai's failure to point to any evidence that I.R.C. § 422(b)(5) was intended not merely to state a requirement for a tax benefit, but also to set forth a general exemption from creditor process, is strong evidence that Congress did not intend it to create an exemption in bankruptcy. Therefore, the Bankruptcy Court was correct in holding that DeNadai's ISOs are not exempt from the estate under section 522(b)(2)(A) by virtue of I.R.C. § 422(b)(5).

## III. CONCLUSION

DeNadai's stock options are property of the estate under 11 U.S.C. § 541(a) to the extent they were the result of pre-petition efforts. The pro rata apportionment between the estate and DeNadai is set forth in the Appendix. Furthermore, DeNadai's stock options are not exempt pursuant to 11 U.S.C. § 522(b)(2)(A) under either state or federal law. Accordingly, the order and decision of the bankruptcy court is AFFIRMED.

## APPENDIX
### ESTATE'S SHARE OF DENADAI'S STOCK OPTIONS

| | Ziff–Davis (ISO) | | ZDNet (ISO) | ZDNet |
|---|---|---|---|---|
| 24 Jun 1998 (Day 0) | | | | |
| | | 21 Dec 1998 (Day 0) | | |
| 31 Mar 1999 (Day 280) | 2,000 | | | |
| 30 Jun 1999 (Day 371) | 500 | | | |
| 30 Sep 1999 (Day 463) | 500 | | | |
| 31 Dec 1999 (Day 555) | 500 | 31 Dec 1999 (Day 375) | 18,415 | 47,210 |
| 31 Mar 2000 (Day 646) | 500 | 31 Mar 2000 (Day 466) | 16,406 | |
| 21 Jun 2000 (Day 728) | Petition Date | 21 Jun 2000 (Day 548) | Petition Date | |
| 30 Jun 2000 (Day 737) | $\frac{728}{737} \times 500$ | 30 Jun 2000 (Day 557) | $\frac{548}{557} \times 4,105$ | $\frac{548}{557} \times 12,301$ |
| 30 Sep 2000 (Day 829) | $\frac{728}{829} \times 500$ | 30 Sep 2000 (Day 649) | | $\frac{548}{649} \times 16,406$ |
| 17 Oct 2000 (Day 846) | Change of Control | 17 Oct 2000 (Day 666) | Change of Control | |

| Date | Amount |
|---|---|
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| 17 Oct 2000 (Day 846) | $\frac{728}{846} \times 500$ |
| Estate's Total | 9,236 (92.4%) |

| Date | Amount 1 | Amount 2 |
|---|---|---|
| 17 Oct 2000 (Day 666) | | $\frac{548}{666} \times 16,407$ |
| 17 Oct 2000 (Day 666) | $\frac{548}{666} \times 16,406$ | |
| 17 Oct 2000 (Day 666) | $\frac{548}{666} \times 4,105$ | $\frac{548}{666} \times 12,301$ |
| 17 Oct 2000 (Day 666) | | $\frac{548}{666} \times 16,406$ |
| 17 Oct 2000 (Day 666) | | $\frac{548}{666} \times 16,407$ |
| 17 Oct 2000 (Day 666) | $\frac{548}{666} \times 16,406$ | |
| 17 Oct 2000 (Day 666) | $\frac{548}{666} \times 4,105$ | $\frac{548}{666} \times 12,301$ |
| 17 Oct 2000 (Day 666) | | $\frac{548}{666} \times 16,406$ |
| 17 Oct 2000 (Day 666) | | $\frac{548}{666} \times 16,407$ |
| Estate's Total | 73,498 (91.9%) | 163,205 (89.4%) |